hWALTZER, Judge.

STATEMENT OF THE CASE

Appellant was indicted for the first degree murder of Anthony Brazley. After trial by a twelve-person jury the appellant was found guilty of second degree murder.[1] He was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. On the date of sentencing his motion for appeal was granted. Briefs were filed in this court and the record was supplemented. The record of this case was sent to the appellant and he was given time to file a pro se brief. He has failed to do so.

FACTS

Early in the morning of 3 September 1995, police officers were called to 2462 No. Johnson Street to investigate a disturbance. A search of the area revealed the body of Anthony Brazley lying in the street around the comer from that address. The officers found the handle of a knife lying in the street near the victim’s body and a knife blade lying on the kitchen floor of an apartment at the above address. An autopsy revealed the victim died of a single stab wound to the base of his neck which punctured a major artery and reached his spine. Although 12the body sustained abrasions to the cheek, shoulder, and chest, there were no defensive knife wounds.
The victim had attended a birthday party earlier that night, where he met with Michelle Guy, with whom he had had a romantic relationship. The victim, various relatives, and Ms. Guy left the party around 2:00 a.m., with the victim first taking his relatives home. The victim and Ms. Guy then went back to her apartment, which was located at 2562 No. Johnson, above the apartment of her uncle and aunt, Gregory and Anita Guy.
Anita Guy testified that she and her husband had also attended the party and arrived home sometime after 2:00 a.m. She testified Michelle Guy’s three daughters were sleeping at her house, but at approximately 3:00 a.m. she moved the girls upstairs to Michelle’s apartment. Anita Guy testified Michelle met her at the door and took the girls, and Anita Guy did not know the victim was also in the apartment. Anita and Gregory Guy then went to bed, and soon thereafter they heard a noise coming from Michelle’s apartment which sounded like something falling over. They heard someone walking over a floor furnace in the apartment and then walking back over the furnace. After they heard a few loud thumps, they got up to investigate. At that point, they heard someone tapping at their bedroom window, and when they looked over they saw Michelle Guy standing outside the window. Michelle told them to call the police.
Anita Guy testified that after calling the police, she and her husband Gregory went *89 upstairs to investigate. They noticed a pool of blood outside their door and a trail of blood going up the stairs. They followed the trad to Michelle’s apartment. Inside the apartment, they found a large quantity of blood, but the only occupants of the apartment were Michelle’s three daughters, who were unharmed hand did not know Michelle’s whereabouts. Anita and Gregory Guy followed the blood trail back downstairs, where they found Michelle emerging from an alley. Michelle was hysterical. Anita took Michelle back to Anita’s apartment. As they were standing in the doorway, Anita noticed a car pull up and saw the appellant Keith Brazley (no relation to the victim) get out of the car. The appellant had had a long-term relationship with Michelle in the past and had lived with her, but at that time they were estranged. At Anita’s insistence, Michelle went inside the apartment, and the appellant left. Anita testified that she then followed Gregory around the corner, where they found the victim lying in the middle of the street.
Michelle’s daughter Diondra Guy, who was eleven years old at the time of the murder, testified she was asleep in her bedroom when she heard someone walking over the floor furnace in the hallway. She looked out and saw someone who looked like the appellant walking toward the kitchen. She testified she heard a drawer opening, and then she heard someone walking back over the floor furnace. She next heard something drop, which sounded to her like glass falling. She waited a short time and then walked to her mother’s bedroom. She found no one in the bedroom but she noticed blood all over the floor. She testified she called her grandmother and then woke her sisters and told them to stay in their bedroom. She went out on the porch but could not see her mother. She testified she sat on the porch until she saw the appellant drive up and get out of his car. She testified that when Anita yelled at her to shut the door, she slammed the door and locked it. She testified further that she remained in the apartment until Anita came upstairs and took the three girls downstairs to her apartment.
Michelle Guy testified she and the appellant had ended their long-term relationship earlier that year, and approximately one month before the murder they bjhad reconciled for three weeks. However, they had again broken up the night before the murder when they became embroiled in an argument. At that time, she asked the appellant to leave, but he returned drunk in the middle of the night. After arguing further with him, she allowed him to sleep on the couch that night, but he left in the morning.
Michelle testified she went to the birthday party with her aunt and uncle, but she met the victim there and eventually returned home with him. She testified she advised the victim to move his van from in front of the apartment because she feared the appellant’s reaction if he saw it parked there, and she also did not want the victim’s fiancee to know he was there. She testified she and the victim then went to bed, but soon Anita appeared at her door with her daughters. She then went back to sleep but was awakened by a knock on the door. She opened the door and was immediately hit in the face. She testified she fell over onto the table, turned around, and saw the appellant walking down the hallway. As the appellant passed her bedroom, the victim woke up. She testified she left the apartment, went downstairs, and asked her uncle to call the police, and she heard “rumbling” coming from her apartment. She testified she heard what sounded like two people coming quickly down the stairs, and she heard someone calling her name. However, because she was frightened, she ran into an alleyway and hid there until her uncle came out of his apartment. She testified she stayed in the doorway of her uncle’s apartment until the appellant reappeared, at which time she ran inside.
Michelle identified the knife as one which she kept in a drawer in her kitchen. She testified the appellant knew the knife was there because he had cooked in the kitchen. She testified she told the appellant the night before that she would consider reconciling with him, but she insisted she did so because she was |5frightened of him. She testified the appellant had threatened her the night *90 before and had held a knife to her throat in the past. She testified she did not know of any problem between the appellant and the victim, but she admitted he was aware of her relationship with the victim and had threatened her before about the victim’s presence in her apartment.
Gregory Guy’s testimony basically tracked that of his wife up to the time he went upstairs to investigate. He testified that after hearing Michelle at the window, he told his wife to call the police, and he went outside to find a pool of blood. He followed the blood trail up the stairs to Michelle’s apartment. Inside the apartment, he saw more blood in Michelle’s bedroom and in the living room and also saw his grandniece, who told him she did not know Michelle’s whereabouts. He testified he told her to wake the other children and go towards Arts Street. When he heard his wife yell, “he’s coming back”, he returned to his apartment and saw the appellant pull up and exit a car. He testified he told the appellant to leave and informed him they had called the police. After the appellant got back in his car and left, Guy again followed the blood trail around the comer. He testified he then saw the appellant’s ear stopped in the middle of the street, approximately two feet from the victim’s body. Guy testified the trunk of the car was open, and the victim’s body was on the street next to it. Guy told the appellant to leave the victim alone. The appellant then knocked down the board he had placed in the trunk to hold the hood open, reentered the car, and drove from the scene.
Officers investigating the murder went to the appellant’s house, where they seized a car which belonged to the appellant’s sister. Various blood samples were taken from the car. In addition, various stipulations were entered at trial. No identifiable fingerprints were found on either the blade or the knife handle. Some |6of the blood samples taken from the car were merely positive for blood, and others were positive for human blood. However, samples taken from the interior of the driver’s door, the steering wheel, and the driver’s headrest were positive for type 0 blood. The victim had type 0 blood.

DISCUSSION

A. Errors Patent

A review of the record for errors patent reveals there are none. Although the jury was not sequestered prior to the submission of the case, the trial transcript indicates this was at the agreement of the parties. See LSA-La.C.Cr.P. art. 791, which provides in part: “In capital eases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered.” As such, there is no error.

B. Assignment of Error

By his sole assignment of error, the appellant contends the trial court erred by denying his motion for mistrial based upon the State’s reference in its opening statement to an inculpatory statement which was later ruled inadmissible at trial. We find that this assignment of error has merit; consequently we reverse the conviction and the sentence and remand for a new trial.

PROCEDURAL BACKGROUND

The trial court refused to grant a motion for mistrial, when defense counsel requested it, after the prosecution: a) impermissibly referred to an inculpatory statement in its opening statement, and b) violated discovery articles. Although the trial court ultimately disallowed the introduction of the inculpatory statement based |7pn the prosecution’s discovery violation, this did not suffice to convert the harmful error into a harmless one.
The appellant had been indicted for first degree murder of one Anthony Brazley during the perpetration or attempted perpetration of an aggravated burglary. After entering a plea of not guilty his counsel filed pretrial motions on 28 November 1995.[2] Once counsel for the appellant received the police report he withdrew all motions on 30 November 1995.
*91 In the appellant’s Bill of Particulars the following question was asked:
Does the State intend to introduce any oral statements alleged to have been made by the defendant to a person(s) not associated with any law enforcement agencies? If so, please give the date, time, place and officers and other persons present at the time of the oral statement and/or statements were made [sic] as provided by La.C.Cr.P. art. 716(B).
The prosecution answered that it intended to introduce “any and all res gestae statements.”
While the record does not contain a transcript of the voir dire examination, it reveals that the jury was death-qualified. In opening statement the prosecution outlined its case, stressing the unauthorized entry into the apartment of the appellant’s former girlfriend. The prosecution went on to outline that the girlfriend ran out of the'apartment and hid outside; that a young child had seen the appellant walk through her bedroom toward the kitchen. The opening statement further showed that the child had known the appellant and, therefore, paid him no mind. In fact, the child went back to sleep.[3] The prosecution further alleged that the appellant armed himself in his former girlfriend’s kitchen with a knife and killed lathe victim. A trad of blood led from the upstairs apartment where the appellant had been admitted by the former girlfriend, led down the stairs, came out of the house and went around a corner onto the street. The body was found in the street. According to the prosecution, the appellant returned in his car to the spot where the body was later found. The prosecution told the jury that the appellant said twice “I HAVE BEEN WAITING TO DO THIS” [the killing]. The prosecution stressed that the appellant had come to the scene of the crime with only one purpose: to kill the victim and that this was not a case of a jilted lover who acted out of jealousy -but committed a deliberate and long planned murder. At the end of the prosecution’s opening statement, the defense attorney moved for a mistrial outside the presence of the jury based on LSA-C.Cr.P. art. 716, because he had not been notified of the appellant’s inculpatory statement.[4] Counsel for the defense did not move for a mistrial based on the prohibition contained in LSA-C.Cr.P. art. 767,[5] but rather insisted that a discovery violation under LSA-C.Cr.P. 716(B) had taken place, because the State had never told him to whom, when and where this statement was allegedly made.
The-prosecution argued that the State had notified the appellant and insisted that the statement referred to in its opening statement was no more than res gestae and, therefore, LSA-C.Cr.P. art. 716(B) did not apply. Defense counsel protested that if he had known about the inculpatory statement, his investigation of the case |9would have been different and that LSA-C.Cr.P. art. 716(B) does not relieve the State from disclosing res gestae statements, although, in his opinion this was not a res gestae statement. Counsel for the defense further moved that if a mistrial would not be granted, then in the alternative the statement should be disallowed as evidence at the appropriate time.
The trial court denied the motion for a mistrial and said:
All right, Mr. Meyer, what I’m going to do is, I’m going to bring the jury back down. I’m going to give them some instructions on opening statements and closing arguments. I’ll make a determination as to whether or not it comes in or not at the *92 appropriate time, when that witness is on the witness stand.
Finally, the court ruled that the statement was not res gestae and would be excluded, because he found that the State had violated the commands of LSA-C.Cr.P. art. 716 and that the statement
“... goes to show the state of mind of this person. The first time he [the defense attorney] knows about this is on the morning of trial after the jury is selected during opening statement. I think he should have been given more notice than that of that sort of statement, that type of statement.”
After the trial court ruled that the statement was inadmissible, the prosecution applied for supervisory writs to this Court; our Court declined to exercise its supervisory jurisdiction.
There is nothing in the record to show that the court admonished the jury concerning opening statements or closing arguments,[6] or that he told them to disregard the impermissible statement pertaining to the inculpatory statement. The hpState did not attempt to elicit the inculpatory statement allegedly made by the appellant to a non-police witness.

ANALYSIS

The prosecution maintains that its discovery responses adequately satisfied the notice obligations of LSA-La.C.Cr.P. arts. 716 and 768. The prosecution continues to insist that the inculpatory statement was no more than res gestae. Additionally, the prosecution argues that the appellant never sought a clarification of the responses given by the State, and, in fact, withdrew all motions for discovery. The prosecution insists that the defense could not claim that it was unduly surprised and that the evidence at trial was so overwhelming that the prosecutor’s reference to the inculpatory statement in opening statement was no more than harmless error. We do not agree.
The violation of LSA-C.Cr.P. art. 767 combined with the violation of the notice requirement of LSA-C.Cr.P. art. 768[7] and the violation of the discovery article in LSA-C.Cr.P. art. 716(B) in this case constitutes grave error, because they led to disastrous results. To classify these errors as harmless, would furnish a dangerous precedent, especially in a first degree murder case where a defendant is in jeopardy for his life.
Here the entire trial strategy of the appellant was geared toward showing that the jilted lover may have killed because of jealousy and, that, because no one was present at the actual killing, there might have been provocation, or perhaps even | nself-defense. The opening statement carries this theme, because the defense attorney stated that from the facts no one could know whether this crime was a manslaughter, self-defense or what led up to the killing. This theme carried through in questioning of the witnesses at trial and at closing argument. The appellant’s theory of the defense was destroyed by the State’s introduction of this inculpatory statement at the inception of the trial, alerting the jury that this was an intentional and deliberate killing. Whatever counsel presented thereafter to the contrary could only have undermined his credibility with the jury.
Since counsel for the defense did not know about the statement and to whom, when and where it had been made as required by LSA-C.Cr.P. art. 716(B), counsel had no clue of the strength of the State’s case. Counsel not only could not investigate whether a statement had in fact been made, but counsel could not tailor his voir dire, opening statement or trial examination of witnesses and closing arguments to the State’s case. A substantial right of the accused, that is the right to prepare an adequate defense, was *93 affected. The State’s discovery answers[8] misled the appellant with regard to the scope and strength of the prosecution’s case and, therefore, unfairly prejudiced him. The State had an affirmative duty to provide reasonably particularized notice of its intent to use an inculpatory statement.
Louisiana discovery rules are intended to eliminate unwarranted prejudice arising from surprises in testimony and evidence, to permit the defense to meet the State’s ease, and to allow a proper assessment of the strength of its evidence in preparing a defense. LSA-C.Cr.P. arts. 716-729. When, as here, a defendant is | ^lulled into a misapprehension of the strength of the State’s case through the prosecution’s failure to disclose timely and fully an inculpatory statement and the defendant becomes aware of it only when it is used in the impermissible fashion it was used in opening statement in this case, basic unfairness results which constitutes reversible error.
Whether intended or not, the State’s discovery responses had misrepresented the strength of the case the prosecution planned to present at trial and thereby subverted the basic purposes of discovery. State v. Allen, 94-2262 (La.11/13/95), 663 So.2d 686, 689. Counsel for the defense was completely surprised and was lulled into a misapprehension of the strength of the State’s case. Had counsel known of the existence of the statement earlier, it is conceivable that a different trial strategy would have been employed. For example, counsel could have requested a continuance to meet the evidence rather than have to move for a mistrial, after a jury was death qualified and then heard the inculpato-ry statement in opening statement.
We reject the State’s argument made during trial and in. brief that its response to discovery was sufficient because the’ statement was res gestae and, therefore, did not merit timely disclosure and could not have been harmful error.[9]

CONCLUSION

| igBecause of the combination of errors committed at the inception of the trial, a mistrial was warranted and the trial court’s failure to grant the motion for a mistrial considering the circumstances of this case constituted reversible error. Accordingly, we reverse the conviction and sentence and remand this case for a new trial.

CONVICTION AND SENTENCE REVERSED. REMANDED FOR A NEW TRIAL.

BYRNES, J., dissents with reasons.

. Although the minute entry of trial indicates the jury convicted the appellant of manslaughter, the verdict sheet indicates the jury returned a verdict of second degree murder.

. The defense filed a motion for a speedy trial, preliminary examination, motion to quash the indictment, motion to suppress the confession, motion to suppress the evidence, prayer for oyer, and a motion for a bill of particulars.

. The testimony of the child at trial was completely different from the version outlined in the opening statement.

. LSA-C.Cr.P. art. 716(B) provides: Upon motion of the defendant, the court shall order the district attorney to inform the defendant of the existence, but not of the contents, of any oral confession or statement or any nature, made by the defendant, which the district attorney intends to offer in evidence at the trial, with the information as to when, where and to whom such oral confession or statement was made.

.LSA-C.Cr.P. art. 767 provides: The state shall not in opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously ruled admissible in the case.

. It appears that it would have been a difficult task to admonish the jury in regards to the incul-patory statement. In fact, such an admonition only would have served to draw more attention to the inculpatory statement.

. LSA-C.Cr.P. art. 768 provides: Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to the beginning of 7. the state’s opening statement. If it *93 fails to do so a confession or inculpatory statement shall not be admissible in evidence.

. Although the defendant waived all discovery motions (presumably those requiring live testimony, the trial judge having indicated as much during arguments concerning the waiver), it cannot be said that he waived also the notice requirements of LSA-C.Cr.P. arts. 716(B) and 768.

. It is unclear upon what authority the State makes this claim. Former LSA-R.S. 15:447 provided in part: "What forms any part of the res gestae is always admissible in evidence.” As per LSA-C.Cr.P. art. 767, the State cannot refer in its opening statement to a defendant’s confession or inculpatory statement unless the statement has been previously deemed admissible. In State v. Belgard, 410 So.2d 720 (La.1982), the Court held that this prohibition does not include statements considered to be res gestae. However, LSA-R.S.15:447 has been repealed, and the present statute dealing with res gestae evidence, LSA-C.E. art. 404 B(l), does not contain this statement.