390 So.2d 886 (1980)
STATE of Louisiana
v.
Robert Dale STATUM.
No. 67525.
Supreme Court of Louisiana.
November 10, 1980.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Leonard K. Knapp, Dist. Atty., Terry Johnson, Abbott J. Reeves, Asst. Dist. Attys., for plaintiff-appellee.
James A. Smith, Smith & Wise, Lake Charles, for defendant-appellant.
*887 BLANCHE, Justice.
Defendant, Robert Dale Statum, was indicted by a grand jury for manslaughter, R.S. 14:31. The defendant's motion to suppress all of his oral and written inculpatory statements was tried before Judge Yelverton of the 14th Judicial District Court and was denied. The defendant was tried before a twelve person jury and was convicted by a vote of 11 to 1. The defendant was sentenced to seven years in the custody of the Louisiana Department of Corrections.
The facts in this case are deduced from the motion to suppress hearing, the defendant's two statements, and the transcribed portions of the trial court which were sent to this Court.
On Saturday, July 28, 1979 the victim, Tammy Lonidier, was a passenger in the defendant's car. Tammy was the sister of the defendant's wife and was 13 years old at the time of her death. During that day, the defendant had several beers and some wine that night. That evening, he told his wife he wanted to "have sex" with her sister, Tammy, and his wife, though upset, went along with the idea in order to "save her marriage". Later that night, on the pretext of going to borrow some money, the defendant, his wife, their two children and Tammy got into the car and drove around the block. Defendant let everyone out of the car and his wife told Tammy to get back in the car with the defendant, who said he wanted to talk with Tammy. Instead of driving around the block, the defendant began driving toward a local skating rink. While the car was going 50 to 55 miles per hour, Tammy opened her door and exited the vehicle. This incident occurred around midnight. She died the next day of multiple injuries suffered from the fall.
After she jumped, defendant returned to his wife and they searched for Tammy without success. They then went to defendant's sister's house and from there, to the DeQuincy Police station to obtain assistance in finding Tammy. The police on duty returned to the area, immediately found Tammy, and called an ambulance.
Since the defendant and his wife were so shaken up and had become hysterical, and because their car would not start, one of the officers gave them a ride back to their trailer home. After taking the defendant and his wife home, the DeQuincy Police got a call from the Lake Charles Sheriff's Office to bring the defendant and his wife in for questioning as to the incident. The police went to the defendant's trailer that morning and asked the defendant and his wife to come in to Lake Charles with them, which they agreed to do.
At the Lake Charles Sheriff's Office, the defendant and his wife were separately interrogated. The defendant made a written statement which, in essence, said his wife had been in the car with him and Tammy, that he and his wife had been arguing, and that Tammy had jumped out of the moving car. No mention was made of the defendant's desire to have sex with Tammy nor the scheme which he and his wife developed toward this goal. The defendant and his wife were then returned by the police to their trailer around dawn.
That Sunday morning, Deputy Albanese came on duty at the Lake Charles Sheriff's Office. After receiving a call from Sheriff Reid and himself wondering about the incident, he dispatched a deputy to go to the defendant's trailer to ask the defendant and his wife to come back in for further questioning. This was done, and the defendant and his wife drove in on their own at 1:00 p. m. on Sunday, July 29, 1979. Again, they were questioned separately. The defendant made a second written statement where he told the true story of his desire to have sex with Tammy, and how they were alone when she exited his car at 50 to 55 miles per hour. Defendant admitted lying at the first written statement, saying he did so because he didn't think anyone would believe him.
At each interrogation session, the defendant was advised of his constitutional rights and he signed a written waiver. The police clearly testified that neither the defendant nor his wife were under arrest, nor did they have probable cause to arrest them, when the statements were made. The police said *888 they were merely investigating the incident and were seeking the defendant's and his wife's assistance. The two statements made by defendant constituted the bulk of the case against him.
Defendant makes two assignments of error. This Court at oral argument asked for and received from the defense and from the state supplemental briefs on a third issue.

Assignment of Error Number 1
Defendant contends the trial court erred in overruling his motion to suppress all oral and written inculpatory statements made by him, as such statements were made at a time when the defendant was under arrest without probable cause in violation of the Fourth Amendment of the United States Constitution.
The state admits the defendant was not arrested until approximately 8:00 p. m. on July 29, 1979 after he had made the second statement. It is the state's position that the defendant and his wife were requested to come to the Lake Charles Sheriff's Office for the first statement to give the initial information about the incident. At that time the police did not know the cause of the incident; some were even terming it a suicide. The defendant and his wife were requested to come in for the second statement when Deputy Albanese, the Chief of Special Investigations, had a suspicion about the case and had been called by Sheriff Reid to look into the matter.
The state contends that both of the statements were taken as part of the overall investigation and that the defendant was not under arrest at any time until after the second statement revealed his involvement. Several deputies testified the defendant was not forced to go make the statements and, once there, he was free to leave any time he wished.
The defendant argues that when he was taken by the police from his trailer to Lake Charles in the early morning hours following the incident that he was, in fact, arrested without probable cause. The resulting first statement should be suppressed for this reason. He then says he was, in fact, ordered to drive into Lake Charles to make the second statement and, in effect, was again placed under arrest without probable cause. He feels that the resulting second statement should be suppressed for this reason, and because of the taint from the first arrest. Additionally, the defendant's wife testified she felt they were under arrest because of the presence of the police with uniforms and guns (though not drawn) at their trailer, and the fact that the police interrogated her and her husband separately and wouldn't let her join her husband until her statement was complete. She said they drove back to the Sheriff's Office at 1:00 p. m. that Sunday to make the second statement because they were ordered to do so and felt they had to comply as if they were arrested.
The issue squarely is was the defendant arrested without probable cause such that his statements should have been suppressed? Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We find that he was not under arrest when he made either of these statements; rather, he was voluntarily assisting in the investigation into Tammy's death. Even if his presence in the Lake Charles Sheriff's Office is regarded as a detention for custodial interrogation, we deem it was based on his consent. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979).
The sequence of events leading up to each statement affirms this finding. Immediately after the incident, the defendant, his wife and sister went to the DeQuincy Police station to obtain assistance in finding Tammy. They initiated the police involvement. Once Tammy was found, the police drove defendant and his wife home because they were hysterical. It was obvious they weren't going to be of any assistance at that time in ascertaining what had happened.
Later, the Lake Charles Sheriff's Office asked the DeQuincy Police to bring the defendant and his wife in for questioning. By now, the defendant and his wife had had *889 time to compose themselves and to let the authorities know what had happened since they were a part of the incident and had initiated the police involvement.
The officers picked up the defendant and his wife in the early morning for the trip to Lake Charles. There was no arrest, were no drawn guns, no handcuffs, no threats-nothing was used to force the defendant and his wife to go to Lake Charles. The defendant and his wife voluntarily went to Lake Charles, made their statements (his was false), and were driven home by the police. At no time were they taken into custody by the police or restrained by the police, as it was testified by several deputies that they were free to go as they pleased. C.Cr.P. art. 201.
Later that morning, the defendant and his wife were requested to come back to the Lake Charles Sheriff's Office by 1:00 p. m. This they did of their own accord, as they drove the 30 miles in their vehicle without any police involvement other than the initial request. They consented freely to drive to the Sheriff's Office and were not under anyone's custody or restraint. C.Cr.P. art. 201.
The defendant was not arrested when he freely left his trailer with the police in the early morning to provide information to an investigation that he initiated. He made his statement and was brought back by the police to his trailer. Again, he was not arrested when he voluntarily drove in to make a second statement to the police, who were further investigating the incident. Only when the defendant's first statement was exposed as a lie was his liberty restrained, as then, the police had probable cause to arrest him.
For the above reasons, this assignment of error is without merit.

Assignment of Error Number 2
Defendant contends the trial court erred in refusing to grant defendant's motion for mistrial after the state used evidence which it had denied was in its possession, and denied it had any intention of using at trial.
Pursuant to C.Cr.P. art. 718, the defendant filed a Motion for Discovery and Inspection on August 30, 1979, which requested in part that the state:
"... be ordered to permit and authorize the defendant to inspect photographs and tangible objects which are in the possession, custody or control of the state, and which are intended for use by the state as evidence at the trial."
The state answered using a standard form and in the portion that pertained to defendant's above request, the state answered "no", which meant it had no photos or tangible objects to be used at trial. Additionally, the state gave the defendant an authorization to inspect all photos and objects at the Sheriff's Office.
At trial, during the direct examination of Deputy Viator, the Department's Criminal Investigator, the state offered in evidence photos (exhibits S-8 through S-17) taken by that officer the morning after the incident. At that time, the defense counsel objected to their introduction on the basis of lack of relevancy and the state's failure to lay a proper foundation. The court overruled the objection and admitted the photographs. No defense objection was made based on the state's failure to properly answer defendant's discovery motion.
Deputy Viator then described each photograph and the location and time it was taken. He said that Exhibit S-12 was a photo of the front, driver's side floorboard of the defendant's vehicle, and that the picture revealed a knife and a wallet on the floorboard just under the front seat. He further testified that he retrieved these items from the vehicle and had brought them to court that day. Defense counsel again objected and moved for a mistrial, solely on the basis of the lack of a proper foundation having been laid. The jury was removed and defense counsel also objected to the introduction of the knife on the same ground. The judge overruled the objections and the jury was returned.
Next the state displayed a large manila envelope, Exhibit S-18, which Deputy Viator explained contained the knife and wallet *890 he had retrieved from the defendant's vehicle. Defense counsel repeated his improper foundation objection and finally added that the state had denied the existence of any photographs or tangible evidence in its answers to the defendant's discovery motion. The jury was again removed.
The trial court ruled that due to the state's failure to advise the defendant of the existence of the knife in response to defendant's discovery motion, it would not be admitted in evidence. However, since the defendant had not objected on this proper ground when the photos were admitted, he let them stand. Noting the potential prejudice of the knife and the state's failure to comply with the discovery rules, the judge ruled that no further reference was to be made to the knife by this witness, either attorney, or either side in its closing arguments.
We have previously held that where the defendant is lulled into a misapprehension of the strength of the state's case and suffers prejudice when the statements are subsequently introduced at trial, basic unfairness which constitutes reversible error results. State v. Boothe, 310 So.2d 826 (La. 1975); State v. Hatter, 350 So.2d 149 (La. 1977). Now, we stand fast to that principle that the state should not be allowed to deceive the defendant by its discovery answers; however, we feel the trial judge properly resolved the situation by his order. According to C.Cr.P. art. 729.5, in pertinent part:
"... during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal as may be appropriate."
Here, the judge promptly prohibited the state from introducing the knife in evidence and, further, did not allow the parties to refer to it in any manner.
Additionally, it is noted that the assistant district attorney conducting the trial did not complete the discovery answer, and the district attorney's office had attached an authorization for the defendant to examine photographs and items at the Sheriff's Office, clearly showing no intent to deceive the defendant. Furthermore, the judge commented that the photograph admitted was so nondescript that it took him 60 seconds to locate the knife in the photo, and he knew what he was looking for. None of these factors alone excuse the state from properly answering the defendant's discovery motion, but when added to the judge's prompt action, we are of the opinion that the defendant suffered no prejudice and that the trial judge was correct in continuing the trial.
We certainly do not condone the trickery that can evolve from the misuse of the discovery motions and answers. The penalties of C.Cr.P. art. 729.5 are readily at hand for the trial judge to employ, as was done in this case. If they are not used, and the situation warrants, this Court will not hesitate to reverse. Such is not the situation here and, for these reasons, this assignment is without merit.

Assignment of Error Number 3
At oral argument on October 14, 1980, this Court asked the state and the defendant to file supplemental briefs on the issue of whether all the elements of manslaughter were met in this occurrence. We find that they were.
The pertinent part of R.S. 14:31 states:
"Manslaughter is: ... (2) A homicide committed, without any intent to cause death or great bodily harm. (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person ..."
The felony which the defendant was attempting to perpetrate was R.S. 14:80, Carnal Knowledge of a Juvenile.
*891 By the defendant's own statement, he and his wife scheme so that he could get Tammy alone and have sex with her. The defendant, a 31 year old male, had this in mind when he drove Tammy, a 13 year old female, toward the skating rink, and she exited the car obviously because of this attempt.
The defendant did not succeed in his intention, for Tammy exited the car before the defendant reached his destination; therefore, he was guilty of Attempt, as defined in R.S. 14:27:
"A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."
The defendant had this juvenile female in the car alone with him and, by his own admission, was going to have sex with her. Clearly, he is guilty of Attempted Carnal Knowledge of a Juvenile. Since this crime is a felony not enumerated in R.S. 14:30 or R.S. 14:30.1, it squarely falls within R.S. 14:31(2)(a) as quoted above.
For this reason, the defendant is guilty of Manslaughter as all the elements of the crime were satisfied.
The defendant's two assignments of error and this Court's question are all resolved against the defendant for the reasons given above. The defendant's conviction and sentence are affirmed.
AFFIRMED.
DIXON, C. J., dissents with reasons.
DENNIS, J., dissents for reasons assigned by DIXON, C. J.
WATSON, J., dissents on the basis of assignment of Error # 3.
LEMMON, J., concurs and assigns reasons.
LEMMON, Justice, concurring.
The only rational explanation for the victim's jumping from a vehicle traveling at 55 miles per hour was to avoid an immediate sexual assault (which defendant admitted he intended). In the light of the evidence most favorable to the prosecution (defendant's own statement), a rational trier of fact would find beyond a reasonable doubt that defendant did some act in furtherance of his admitted intention and caused the victim's jump.[1] Thus, this was a homicide which occurred when defendant was at least engaged in the attempted perpetuation of an intentional misdemeanor directly affecting the person, and the jury properly found defendant guilty of manslaughter. R.S. 14:31(2)(a) and 14:36 and 37.
DIXON, Chief Justice.
I respectfully dissent, finding no evidence of a homicide nor of an attempted felony.
NOTES
[1] For a factually similar case with an interesting discussion of this problem, see Patterson v. State, 181 Ga. 698, 184 S.E. 309 (1936).