663 So.2d 686 (1995)
STATE of Louisiana
v.
Winford ALLEN.
No. 94-K-2262.
Supreme Court of Louisiana.
November 13, 1995.
Gary T. Chapman, for Applicant.
Richard P. Ieyoub, Attorney General, Duncan S. Kemp, III, Dist. Attorney, Clara E. Toombs, Cassandra Butler, Freeman Ramsey, for Respondent.
PER CURIAM:[*]
Relator was charged by bill of information with arson with the intent to defraud in violation of La.R.S. 14:53. After waiving a jury, he was found guilty as charged by the trial court. The court sentenced him to five years at hard labor, with all but 30 days of that term suspended, and placed relator on probation for five years. The First Circuit affirmed relator's conviction and sentence on direct appeal, ordering the district court to correct one of the conditions placed on the probationary term. State v. Allen, 93-1632 (La.App. 1st Cir. 8/2/94), 642 So.2d 327. We granted writs to consider relator's argument that the state's discovery answers misled him with regard to the scope and strength of the prosecution's case and thereby unfairly prejudiced his defense. Under the particular circumstances of this case, we agree that the state's attempt to prove that a prior and uncharged fire involving the same structure *687 was also arson, contrary to its discovery response that it would not introduce evidence of any other crime, surprised and prejudiced the defense. We reverse relator's conviction accordingly.
At approximately 6:00 a.m. on the morning of May 1, 1991, the Hammond and Ponchatoula Fire Departments responded to the report of smoke pouring out of relator's home on Adams Road. Fire fighters forced open the back door and put out a blaze in the kitchen. A built-in electric stove and the cabinet below it were destroyed and some blackening of the ceiling joists above the stove had occurred. The fire had not penetrated the kitchen ceiling or the wall separating the kitchen from the living room, however, and the rest of the house had escaped damage. Steve Wells, an investigator for the Hammond Fire Prevention Bureau, arrived on the scene and concluded from the appearance of the glass stove top that one of the burners on the stove had been left on and melted an aluminum pot, igniting the fire. Wells had no reason to suspect arson at that point. According to standard practice, he contacted LP & L and was still on the scene when a representative from the company turned off the electricity to the home. Wells subsequently identified the owner of the home and attempted without success to contact relator that afternoon.
On the morning of May 2, 1991, barely 20 hours later, Wells and the Hammond fire fighters returned to relator's home to fight a much larger fire which ultimately consumed half of the structure before they brought it under control. According to Wells, he knew as he approached the house that the fire "wasn't a re-kindle because the opposite end of the house was totally destroyed," while the roof and attic over the kitchen had remained undamaged. Wells determined that the blaze had originated in the southwest bedroom and then spread to the attic, and he immediately classified it as arson. Relator, who finally contacted Wells on the afternoon of May 2, 1991, became a suspect after the investigation tied him to a blue El Camino observed leaving the scene shortly before the fire began. The investigation also revealed that relator had fallen behind on his mortgage payments and faced defaulting on the loan. In retrospect, given the second fire, Wells concluded that both blazes had been deliberately set. That opinion was shared by Edward Salisbury, a fire investigator employed by State Farm, which carried the insurance on the home. Salisbury's reconstruction of the scene on the day after the May 2 fire convinced him that the May 1 blaze had in fact begun in the cabinet below the stove top and spread upward to give the appearance of an accidental electrical fire. Salisbury's testimony directly attacked relator's defense that the May 2 fire had been either a rekindle of the May 1 fire, caused when a spark followed the rising smoke into the attic and along the length of the house before settling into the insulation at the other end, or the work of a vandal taking advantage of the broken back door to the house left unlocked by the fire fighters when they departed on the morning of May 1.
In its supplemental answers to relator's application for a bill of particulars, the state made clear that it had charged relator only with the May 2, 1991 fire and that it knew of no other criminal offenses "that need[ed] to be introduced in court concerning this case." The state also responded to relator's motion for oyer by indicating that it did not intend "to introduce evidence of other crimes...." In his opening statement, however, the prosecutor recounted the events of May 1, 1991, and told the court that the fire "was clearly an arson." Counsel immediately objected on grounds that the state's discovery responses had failed to give him the notice required by State v. Prieur, 277 So.2d 126 (La.1973), for introducing other crimes evidence. Without directly addressing the notice question, the trial court ruled that evidence of the May 1 fire was admissible under Prieur to prove "knowledge, intent, s[ystem] or motive." Counsel renewed his objection, and received the same ruling from the court, when Salisbury took the stand and testified in the state's case-in-chief.
The state's affirmative duty to provide "reasonable particularized notice of its intent to use other crimes evidence is separate and independent of the question of the admissibility of the evidence." State v. Goza, *688 408 So.2d 1349, 1353 (La.1982). The trial court wrongly assumed otherwise, but we need not decide here whether testimony regarding the May 1 fire constituted system and intent evidence under L.C.E. art. 404(B) and our Prieur decision, for which notice is required, or evidence of "conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding," Art. 404(B), for which notice is not required. La.C.Cr.P. art. 720. Without regard to the question of its culpable origins, the occurrence of the May 1 fire clearly was so intertwined with the subsequent May 2 blaze that neither the state, nor the defense for that matter, could have presented a complete account of the circumstances surrounding the charged offense to the factfinder without referring to it. State v. Brewington, 601 So.2d 656 (La.1992); see also State v. Boone, 364 So.2d 978 (La.1978) (aborted conspiracy to burn one of defendant's homes and conspiracy to burn another of his homes consummated several months later "were integral parts of a single transaction"). Whether required to respond or not, however, the state's discovery answers affirmatively assured defense counsel in the broadest possible language, which reasonably encompassed both system and intent and integral act evidence, that it did not intend to introduce evidence of any other crime. In the context of other discovery, the response indicated that the state would not attempt to prove, contrary to the initial findings of the Hammond Fire Department, that the May 1 fire had also been deliberately set.
Louisiana's criminal discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, to permit the defense to meet the state's case, and to allow a proper assessment of the strength of its evidence in preparing a defense. La.C.Cr.P. arts. 716-729; State v. Toomer, 395 So.2d 1320 (La.1981); State v. Statum, 390 So.2d 886, 889-890 (La. 1980), cert. denied, 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 619 (1981). When the defendant is lulled into a misapprehension of the strength of the state's case through the prosecution's failure to disclose timely or fully and the defendant suffers prejudice when the undisclosed evidence is used against him, basic unfairness results which constitutes reversible error. State v. Mitchell, 412 So.2d 1042 (La.1982); State v. Davis, 399 So.2d 1168 (La.1981); State v. Meshell, 392 So.2d 433 (La.1980).
In this case, fire inspector Wells arrived at his opinion that the May 2 fire had been an arson by a "process of elimination." With no other source of energy coming into the all-electric house after LP & L shut off the meter, Wells concluded in his report made available to counsel before trial, as he would then testify at trial, that the fire originating in the southwest bedroom had to have been deliberately set. The coincidence of two fires within 20 hours led Wells to speculate that the May 1 fire was also an arson, although he had seen no direct evidence to that effect. At the defense request, Bruce Cutrer, the fire chief for the Tangipahoa Fire Protection Department, inspected the scene of the fires on August 11, 1991, one day before trial. As did Wells, whom he had trained, Cutrer found affirmative evidence only of a stove top fire which had burned downward into the cabinet, scorching the tops of the cabinet doors but not the bottoms. When trial started, counsel reasonably believed that both the state and defense experts called to testify would agree on the probable origins of the May 1 fire. Those inherently ambiguous origins did not exclude an innocent explanation of the May 1 fire and did not preclude a defense based on a theory that the May 2 fire was simply a rekindle of the first or the independent work of another person.
Salisbury's testimony unquestionably strengthened the state's case by presenting affirmative evidence of the May 1 fire's incendiary origins. Defense counsel was aware of the conclusions expressed in Salisbury's report but not of the state's intent to take advantage of them at trial. The defense expert Bruce Cutrer was not aware that Salisbury had reconstructed the scene only one day after the fire and was not prepared for cross-examination based on the findings of the private fire investigator hired by relator's insurance company to protect it from fraudulent claims. While he did not abandon his own opinion of the May 1 fire's origins, Cutrer acknowledged that Salisbury may *689 have been right about the fire because "he had more to work with ... than what I did a year later."
In the present case, if the state had conceived of Salisbury's findings as evidence that the defendant systematically attempted to destroy his home to collect on his insurance policy, it should have provided the defense with notice. State v. Goza, supra. If the state viewed the May 1 fire as part of a single transaction consummated on May 2, it could have responded that the defense was not entitled to the information it sought or expressly reserved its right to use evidence of defendant's other criminal acts which formed an integral part of the charged offense. Based on these responses, the defense could have prepared for the eventuality that the state would attempt to prove that the closely connected May 1 fire was an arson and, thus, reevaluated its trial strategy, particularly with regard to its theory that the second fire had been a rekindle of the first. Instead, the state chose to inform the defendant affirmatively that it would not use any kind of other crimes evidence. Consequently, at the time the state made known its intent to rely on Salisbury's findings, the defense had already set its course dictated in part by the particular way in which the state answered its discovery requests. Whether intended to do so or not, the state's discovery responses had misrepresented the strength of the case the prosecution planned to present at trial and thereby subverted the basic purposes of discovery.
We therefore reverse relator's conviction, vacate his sentence, and remand this case to the district court for all further proceedings not inconsistent with this opinion.
CONVICTION REVERSED; SENTENCE VACATED; CASE REMANDED.
NOTES
[*] Judge Lemmie O. Hightower, Court of Appeal, Second Circuit, sitting by assignment in the vacancy created by the resignation of Dennis, J.

Kimball, J., not on panel. Rule IV, Part 2, Sec. 3.