JjBAGNERIS, Judge.

STATEMENT OF THE CASE

On November 19, 1999, in case #410-779, George Lee, III, (“the defendant”) was charged by indictment with two counts of sexual battery, two counts of extortion, and three counts of second degree kidnapping, charges to which he subsequently pled not guilty. Some counts were severed, and he was tried on January 20, 2000. The jury found him not guilty of one count of extortion and could not agree on a verdict as to one count of sexual battery and two counts of kidnapping. Trial was reset, and on February 24, 2000, the State nolle prosequied the case.
On that same date, in case #412-994, the State reinstituted the remaining charges and added more, charging the defendant with six counts of forcible rape and four counts of second degree kidnapping. The defendant again pled not guilty to all charges. On March 30, 2000, the *658 court severed some of the counts, and the State noted its intent to seek writs. This Court granted writs and ordered that the counts be tried together due to the similarities of the incidents. State v. Lee, 2000-0760, unpub. (La.App. 4 Cir. 3/31/00), 759 So.2d 78. The Supreme Court denied writs. State v. Lee, 2000-0937 (La.4/3/00), 759 So.2d 78.
|2On April 3, 2000, at the beginning of trial, the defense again moved to sever some of the counts, and the court denied the motion. The defense sought writs, and this Court denied the application. State v. Lee, 2000-0782, unpub. (La.App. 4 Cir. 4/3/00), 759 So.2d 78. On April 5, 2000, the trial court declared a mistrial, finding the State had concealed Brady material. The court ordered the State to produce its entire file for the defense. The State noted its intent and sought writs in this Court. This Court granted writs, vacated the trial court’s order; and ordered the State to review its file and produce any evidence which bears on the credibility of its witnesses. This Court also ordered the State to provide the defense with a list of any statements in its possession, including the name of the person who gave the statement and the date the statement was made. This Court further stated: “Upon request by the State, motion of the defense or upon its own initiative, the trial court may review any evidence in camera to determine whether the defense is entitled to it.” State v. Lee, 2000-0831, p. 7 (La. App. 4 Cir. 5/8/00), 767 So.2d 97,. The defendant sought writs in the Supreme Court but then moved to dismiss the application; that motion was granted on June 21, 2000.
On May 19, 2000, the State nolle prose-quied the charges in case # 412-994; they reinstituted the charges and added additional counts in new case #414-519, the present case, wherein the defendant is charged with seven counts of forcible rape and five counts of second degree kidnapping. Again, the defendant pled not guilty to all counts. Pursuant to this Court’s ruling in 2000-K-0831, the State produced the list of all statements in its possession. Trial was set for June 13, 2000. According to the State in a prior application, on May 30, 2000, it turned over the tapes of these statements to the court for an in camera inspection for any Brady material. The court then turned the tapes over to the defense. The State learned of |3the trial court’s action on June 12, 2000, the day before trial. The State noted its objection to the court’s action. The court granted the defense a continuance of the trial to August 21, 2000. On June 13, 2000, the parties again met in court, and at that time the court learned that the State was again in possession of the taped statements. The court ordered the State to give the tapes back to the defendant, admitting that it did not review the tapes before handing them over to the defense because it would have taken too much time to do so. The State objected and noted its intent to seek writs. The State sought relief from the trial court’s ruling. The trial court stayed its order and reset the trial for September 15, 2000. On August 29, 2000, this Court granted the writ, noted that the trial court had disregarded this Court’s disposition in writ 2000-K-0831, and again ordered the trial court to conduct an in camera inspection of the tapes before ordering that only the tapes containing exculpatory material should be turned over to the defense. State v. Lee, 2000-1393, unpub. (La.App. 4 Cir. 8/29/00), 759 So.2d 78.
Trial was reset to October 17, 2000, and continued to October 18, 2000, when it began. Trial continued on October 19, 2000 and October 20, 2000. On October 20, 2000, defense counsel filed a motion for contempt for prosecutorial misconduct on the part of the prosecutor, Assistant District Attorney Lionel Burns (“Mr. Burns” or “Lionel Burns”). The defendant filed a motion to suppress evidence, motion for a mistrial, and motion for contempt as to Lionel Burns, the prosecutor. On October *659 23-25, 2000 the hearing on the motions was held.
On October 25, 2000, the trial court ordered the jurors into the courtroom and declared a mistrial and released the jurors. The court did not allow the State to call two more witnesses on the defense motion. The State proffered the testimony of the two witnesses who would have testified. The trial court dismissed the |4defense motion for contempt because defense counsel had no grounds to move for contempt; however, the court, on its own motion, found the prosecutor, Lionel Burns, in constructive contempt. Alternatively the trial court found prosecutorial misconduct. The trial court sentenced the prosecutor to six months in Orleans Parish Prison.[1] The trial court granted the motion to suppress and the motion for a mistrial. The court declared that the motion concerning discovery rule violations was moot. The State noticed its intent to file for writs as to the constructive contempt and the decision to grant the motion to suppress and orally requested a stay order, which was denied. The trial was reset for January 9, 2001.
On October 25, 2000, the State filed an emergency writ in this Court relating to the issue of contempt. This Court granted a stay order, ordered the prosecutor released from jail, ordered the State to supplement the writ application, and ordered the defense to file a response. On October 31, 2000, this Court granted the State’s emergency writ relating to the prosecutor’s contempt and vacated the contempt order because the mandatory procedure set out in La.C.Cr.P. art. 24 had not been followed. This Court remanded the matter for proceedings consistent with the writ disposition. State v. Lee, 2000-2357, unpub. (La.App. 4 Cir. 10/31/00), 759 So.2d 78.[2]
The State has now filed this application seeking review of the trial court’s October 25, 2000 decision to suppress the napkins found within the pocket of the defendant’s pants, which were seized by police officers pursuant to a search warrant.

\ .FACTS

This writ involves a pre-trial decision and the facts of the case are not necessary to determine whether the evidence should have been suppressed.

LAW AND DISCUSSION

The State argues that the trial court erred by suppressing the two crumpled napkins found in the pocket of the defendant’s pants by the prosecutor. The State notes that the police uniform pants were seized from the ’ defendant’s residence along with other items when the police officers executed a search warrant; the pants had not been suppressed after an earlier suppression hearing. The State claims that Lionel Burns found the two crumpled napkins in the defendant’s pants on the evening of October 18, 2000, after trial had recessed for the day. Mr. Burns and Assistant District Attorney Keva Landrum (“Ms. Landrum”) were going through the evidence in preparation for trial, and they did not realize the significance of the napkins. The State declares: “To date, there has been no showing that the origin of the napkins were (sic) from any place other than in the defendant’s pants pockets which were never checked by the police.” The State also notes that the trial court did not mention that it suppressed the evidence based on lack of notice, and the fact that the trial has been *660 reset to January 9, 2001 avoids any surprise or the lack of opportunity for the defense to prepare for trial presentation of the evidence.
According to the trial court’s judgment, the defense requested a mistrial after Sgt. Ray’s testimony at trial, during which he removed napkins from the uniform | fipants in evidence. According to the October 20, 2000 minute entry, defense counsel filed a motion for contempt for prosecutorial misconduct specifically alleging that the prosecutor, Lionel Burns, planted the napkins in the defendant’s rear right pants pocket. The defendant also filed a motion to suppress evidence, and motion for a mistrial.
On October 23-25, 2000, the hearing on the motions was held. Hans Sinha represented the defendant only for purposes of the hearing because defense counsel, Robert Jenkins, might testify. Defense counsel alleged that Mr. Burns had an obligation to turn over what was discovered immediately and that someone had planted the napkins.
The Hearing on the Motions
Sgt. Ronald Ray, the lead investigator, and Sgt. Harrison, whose name was on the evidence tag, both testified that they never went into the pockets of the defendant’s uniform pants; they only felt for weapons or something out of the ordinary. Several A.D.A.S involved in the case at some point (Paulette Holohan, Juliette Clerk, and Jeff Davidson) stated that they had not gone into the pockets of the uniform pants.
Mr. Burns testified that he had been involved in the prior trial as second chair, and he did go through the evidence. Rather, the evidence was left in the evidence bags. Mr. Burns testified that currently, he was the lead prosecutor, and he was going through the evidence in order to be prepared for the next day. Ms. Land-rum, Tony Rovello, and the law clerk, Zaren James, were present. Mr. Burns stated that he pulled out the uniform pants and noted that there was something in |7the pants. According to Mr. Burns, he found a wad of napkins, but he did not understand their significance until the cross-examination of Sgt. Ray the next day at trial when there were questions about napkins found at the crime scenes. Mr. Burns stated that Ms. Landrum picked up the pants and pointed out the napkins in the pocket to Mr. Burns. Mr. Burns then asked Sgt. Ray whether any prior A.D.A.S had asked him to check the inside of the pants. After the officer’s negative answer, Mr. Burns asked the sergeant to go through the pockets, and he found the napkins. Then Sgt. Ray was asked to compare them to the other napkins found by the police at two of the crime scenes; he said that all napkins appeared the same. Pursuant to the court’s questioning, Mr. Burns stated that he did not inspect the other clothing and uniforms; he was just putting the items out that night. Mr. Burns agreed that he grabbed or reached for the uniform pants and felt something in the rear pocket. He could not recall whether the defense had made an issue of the napkins in the second trial in which he had been involved.
Ms. Landrum testified that she was with Lionel Burns when he discovered the napkins, but she never handled the pants. According to Ms. Landrum, Mr. Burns said out loud that there were napkins in the pocket in the pants. Ms. Landrum said that the pants were introduced into evidence at trial while Sgt. Ray was on the stand. Then on cross-examination, defense counsel asked about the tissues that had been found at the scenes of the first two crimes. On redirect Mr. Burns pursued questioning about the tissues. Ms. Landrum stated that she then recalled the tissues Mr. Burns had found. She picked up the pants and caught Mr. Burns’ attention; Mr. Burns asked Sgt. Ray to go through the pants. Ms. Landrum stated that she and Mr. Burns did not consider the napkins of great evidentiary value on the night that they were found. Not until the next day when Sgt. Ray on Lcross-examination mentioned the napkins or tissues found at each scene did their signifi- *661 canee become apparent. When she was recalled to the stand, Ms. Landrum answered affirmatively when she was asked whether she saw Mr. Burns discover the napkins, but she did not know whether the pants were in the box or already out. She said that she saw no reason to look through any other clothing.
Zaren James (“Ms. James”) stated that she wTas present, along with Ms. Landrum, when the A.D.A.S were looking at the evidence for the next day of trial. She was putting the evidence bags in a certain order. No one was going through the items of evidence. Ms. James stated that she had no knowledge of someone finding napkins in the uniform pants. Her only recollection of someone finding napkins was during trial testimony.
Tony Rovello (“Mr. Rovello”), the A.D.A. for Section “K” of Criminal District Court, testified that he was there helping with the evidence for the next day’s trial. He had taken out the police uniforms and put them back into the evidence bag. He did not remember someone finding napkins inside one of the pants pockets. His first knowledge of the napkins occurred during Sgt. Ray’s testimony the next day at trial. Mr. Rovello said that he and the law clerk were handling the evidence at that time, not Mr. Burns and Ms. Landrum. When he left, the law clerk, Ms. Landrum and Mr. Burns remained, but most of the evidence had already been put into bags and the box.
On October 24, 2000, Theresa Thompson (“Ms. Thompson”), the NOPD property clerk who received the pants and other evidence, stated that she or the officer usually goes through the pockets of clothing as general procedure. Ms. Thompson testified, however, that she did not remember this specific case. Sgt. William Gay, who watched Officer Lee during the execution of the search warrant, Rstated that he seized no evidence from Lee’s residence, but he saw uniform pants being seized. He said that he might not have checked pockets at that time, but he would check pockets before logging in evidence.
Defense counsel, Robert Jenkins, testified that during the first trial (that ended in a mistrial) he searched the four pockets of the uniform pants looking for Officer Lee’s wallet containing his police identification. No napkins were in the pants at that time. There was nothing in the back pockets.
Lionel Burns was called to the stand by the State. He was asked if he planted the napkins. Mr. Burns replied: “Not at all. I would never do that.” Mr. Burns stated that he never had the pants tested for seminal fluid. He said that he was pulling out the pants from the bag because he and Ms. Landrum had decided to put all the evidence out on the table, especially the police uniform. He claimed that he was the only one who would touch the clothing because the female prosecutors did not touch clothing in rape cases. The trial court attempted to clarify whether Mr. Burns was stating that female A.D.A.S ignored such evidence in rape cases. Mr. Burns said that he did not check any other pockets because “[c]hecking the pockets was not important.”
Ursula Hartaway and Cathy Porter, alleged victims who were called by the court, testified that they never mentioned napkins in their statements to police, and officers never questioned them about tissues or napkins. Ms. Porter said that the perpetrator wrapped a condom in a paper towel and threw it away. Darcel West, another alleged victim, said that she told the police that the perpetrator wiped himself afterward, but she could not say what he used.
According to the October 25, 2000 transcript, the trial court ordered the jurors into the courtroom, declared a mistrial and then released the jurors. The lincourt did not allow the State to call two more witnesses on the defense motion because their testimony was not relevant and would not affect the court’s decision. The State then proffered the testimony of former A.D.A. *662 Jeff Davidson (“Mr. Davidson”) and Detective Toni Blanco. Mr. Davidson was the lead counsel in the prior trial and the prosecutor who handed Mr. Jenkins the pants prior to presenting the evidence to the witness. According to the State, Mr. Davidson would have refuted Mr. Jenkins’ testimony by declaring that Mr. Jenkins never took the pants out of the evidence bag. According to the State, Detective Toni Blanco, who had submitted over forty pieces of clothing as a sex crimes detective, would have testified that she had never seen a property clerk go through pockets.
The defense argued that the napkins should have been suppressed because they were not noted in the return on the search warrant; there was nothing in the record to indicate that napkins were found in the pants pocket of the defendant’s police uniform. There was no chain of custody as to the evidence, which was never logged into the evidence and property room. Counsel argued that the napkins should not be admitted before the fact finder. Counsel then contended that a mistrial should be granted because the impermissible and possibly prejudicial evidence had been placed before the jury. Defense counsel argued that the way the napkins were found and not turned over to the defense was at the least a discovery violation. The prosecution did not immediately disclose the evidence to the defense. Instead Mr. Burns waited until he was in the courtroom to “spring it in front of the jury.” Lastly, defense counsel argued that double jeopardy should attach. Counsel contended that the testimony of the police officers that they did not examine or look in the pants pockets “defies the imagination.” Counsel noted that the clerk, who accepted the pants into the evidence room, testified that it was |nher procedure to have the police officers empty the pockets before accepting a pair of pants. Further, it was her procedure to double-check by emptying the pockets herself.
The State argued to the trial court that there had been no prosecutorial misconduct. The State argued that the A.D.A.S involved in the case had done nothing malicious or willful to violate the orders of the court because they did not realize the significance of the napkins. The A.D.A.S did not plant evidence. Apparently, no A.D.A. went through the pockets of the defendant’s pants until that night when the napkins or tissues were found. To show that Mr. Burns did not consider the napkins significant, the State noted that the evidence was not mentioned in the State’s opening argument or the State’s direct examination of Sgt. Ray. Only after the defense cross-examination, when the sergeant noted that tissues or napkins were found at crime scenes, did Mr. Burns’ co-counsel, Ms. Landrum, remind Mr. Burns of the tissues or napkins found in the pocket. The trial court dismissed the defense motion for contempt because defense counsel had no grounds to move for contempt; however, the court on its own motion found the prosecutor, Lionel Burns, in constructive contempt, or alternatively, it found prosecutorial misconduct. The trial court granted the motion to suppress and the motion for a mistrial. The court declared that the motion concerning discovery rule violations was moot.
The Judgment
The trial court explained its reasons for its judgment. The court stated that Sgt. Ray testified that he felt the pants, but he did not feel the wad of napkins. Theresa Thompson, the property room clerk, testified to the procedure of emptying the pockets in the presence of the police officer, but the wad of napkins was not h ¿found. Tony Rovello said that he examined the uniforms and did not find the napkins. Mr. Rovello and Ms. Zaren James did not see Mr. Burns with the napkins or hear Mr. Burns say that he found napkins. Ms. Landrum stated that Mr. Burns informed her that he found the napkins, but she did not see Mr. Burns find the napkins. Mr. Burns testified that *663 he found the napkins in the uniform pants and commented that he had made the discovery, but he did not examine any other clothing.
The trial court noted that four victims testified that the perpetrator allegedly used napkins or something else to wipe himself after the act or wrapped a condom in something. It also stated that police officers had confiscated napkins from two of the alleged crime scenes (introduced as evidence in all the trials), and prior prosecutors stated that they had not found the thick wad of napkins in the defendant’s pants. The court noted that the State had not produced any witnesses to refute the testimony of those witnesses (including police officers, A.D.A.S, and a law clerk) who either had physical contact with the pants or were present when Mr. Burns allegedly discovered the thick wad of napkins. The trial court stated: “The Court concludes Mr. Burns’ testimony to be implausible and improbable.” After making his ruling as to the motions, the court declared: “I draw no pleasure in reaching this decision. Each of us within the criminal justice system have (sic) the duty not only to administer justice, but to follow the law and demonstrate to society defendants will receive a fair trial and victims will secure justice.”
113Law and Analysis
Usually the issue before a trial court at a hearing on a motion to suppress is whether the evidence should be excluded as unconstitutionally seized. In State v. Green, 454 So.2d 885, 886 (La.App. 4th Cir.1984), this Court stated:
A motion may be used to suppress evidence taken by means of an “unconstitutional search and seizure”, La.C.Cr.P. Art. 703(A), but our procedure does not authorize the use of the motion to suppress to test the admissibility of evidence constitutionally seized. Questions of admissibility, relevance, weight and eonnexity are properly resolved at trial on the merits. State v. Gamier, 261 La. 802, 261 So.2d 221 (1972). See also State v. Murray, 357 So.2d 1121 (La. 1978), and compare, State v. Bienvenu, 260 La. 1023, 258 So.2d 72 (1972), footnote 1, and State v. Dudek, 263 La. 258, 268 So.2d 217 (1972).
The admissibility of evidence is dependent upon the circumstances of the search; evidence may be suppressed if it was obtained by means of an unconstitutional search or seizure. See State v. Bradford, 98-1428 (La.App. 4 Cir. 12/9/98), 729 So.2d 1049. If no constitutional rights are violated, evidence is not subject to suppression under La.C.Cr.P. art. 703. See State v. Murray, 357 So.2d 1121 (La. 1978); La.C.Cr.P. art. 703, Comment (b). Generally, questions of admissibility, relevance and weight of evidence are properly resolved at trial on the merits, not by pretrial motions. State v. Tanner, 457 So.2d 1172 (La.1984). A defect in the chain of custody goes to the weight of the evidence rather than its admissibility. State v. Sam, 412 So.2d 1082 (La.1982); State v. Merrill, 94-0716 (La.App. 4 Cir. 1/31/95), 650 So.2d 793, writ denied, 95-0530 (La.6/23/95), 656 So.2d 1012.
Because the pants (the napkins were found in the pants pocket) were properly seized pursuant to a search warrant executed by police officers, no unconstitutional seizure occurred. Testimony that the prosecutor allegedly found the napkins in the pocket of the defendant’s pants because no one else had 114previously checked the pocket would usually go to the weight of the evidence, not to its admissibility. See State v. Tassin, 536 So.2d 402 (La. 1988), cert. denied, 493 U.S. 874, 110 S.Ct. 205, 107 L.Ed.2d 159 (1989); State v. Gentry, 462 So.2d 624 (La.1985).
However, this case presents an unusual set of circumstances. The trial court did not believe the prosecutor when he claimed that he had found the wad of napkins in the pocket of the defendant’s uniform pants; therefore, the court decided that the prosecutor would not be allowed to introduce the napkins into evi *664 dence before the jury and suppressed the napkins.
The exclusionary rule was designed to prevent the use of evidence tainted by flagrant police misconduct in order to deter law enforcement from violating the suspects’ Fourth Amendment rights. State v. Aicklen, 2000-1181 (La.App. 4 Cir. 6/14/00), 767 So.2d 116, 2000 WL 769641. It would appear that prosecutorial misconduct should be a far greater concern. Some Louisiana circuit courts of appeal have stated that a motion to suppress evidence or a motion to quash is a proper procedural vehicle to assert a claim of governmental misconduct. State v. Smith, 614 So.2d 778 (La.App. 2nd Cir.1993); State v. Boyd, 548 So.2d 1265 (La.App. 2nd Cir.1989); State v. Marks, 503 So.2d 32 (La.App. 1st Cir.1986). That jurisprudence focuses on the quashing of the indictment because of governmental misconduct, primarily that of police officers, their informers or agents.
In Maumus v. Department of Police, New Orleans, 457 So.2d 37, 48-49 (La.App. 4th Cir.1984), this Court discussed the constitutional considerations of the questionable actions by the Office of Municipal Investigation taken in a case resulting in a police officer losing his livelihood:
hesitate and local governments are regulated in their conduct towards individuals by the Fourteenth Amendment of the United States Constitution, which provides, in pertinent part:
... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
[[Image here]]
The concept of “due process” is rooted in the canons of decency and fairness, which express the notions of justice of English speaking people. U.S.C.A.Cons.Amend. 14. See: Rochin v. People of Calif, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). The courts, through the exercise of their judicial power are responsible for insuring that fundamental fairness is preserved. See: United States v. Graves, 556 F.2d 1319 (5th Cir., 1977).
In certain prescribed instances the Government is estopped from bringing a prosecution because of their own misconduct. See: Rochin v. People of California, supra. Hampton v. U.S., 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); U.S. v. Graves, supra. The involvement of the government agents in a crime will bar prosecution if the methods used violate fundamental fairness and due process so as to be characterized as too over reaching. See: Rochin v. People of California, supra; Hampton v. U.S. In determining the propriety of the government’s conduct the courts must engage in a balancing act wherein they weigh the objectives of keeping the trial process as an efficient means of determining truth against the need for keeping law enforcement practices at a level consistent with standards of society. See: Tate v. U.S., 283 F.2d 377 (D.C.Cir., 1960). That is, the courts must balance the societal interest of punishing wrongdoers against the rights of citizens to be free from government-induced criminality. See: U.S. v. Archer, 486 F.2d 670 (2nd Cir., 1973).
In Maumus, which is cited often in criminal cases involving police and governmental misconduct, this Court determined that the Office of Municipal Investigation exceeded the bounds of legal propriety, and its tactics of inducement were so pervasive as to constitute governmental misconduct. In reversing the removal of the police officer from the NOPD, this Court declared:
Fundamental fairness does not permit us to contenance (sic) such egregious conduct within the framework of criminal prosecutions, nor shall we do so *665 within the framework of municipal disciplinary actions. 11fiIt would be a denial of due process to allow an individual to be disciplined (and thereby, to forfeit his livelihood) as a result of such govern-mentally created violations of employment regulations.
Id. at 49. “In assessing a claim of governmental misconduct, the trial court must decide if governmental participation is so outrageous or fundamentally unfair that it deprives a defendant of due process.... ” State v. Hardy, 98-0025, p. 7 (La.App. 5 Cir. 5/13/98), 715 So.2d 466, 470, quoting State v. Caldwell, 616 So.2d 713 (La.App. 3rd Cir.1993), writ granted in. part on other grounds, 620 So.2d 859 (La.1993). It would appear that in this case the trial court felt that fundamental fairness and due process considerations dictated that the napkins be suppressed.
In State v. Fontenot, 616 So.2d 1353 (La.App. 3rd Cir.1993), the defendant filed a motion to quash the indictment on the ground of prosecutorial misconduct. He alleged that the Texas prosecutor, who had not been able to go forward with the case due to lack of jurisdiction, made statements to the press which were likely to materially prejudice the criminal proceedings against the defendant. The defendant further argued that the resulting publicity deprived him of the right to a jury trial in the parish in which the offense was committed, and to due process. The Third Circuit stated that the Texas prosecutor was not an agent of this State, and she acted without the participation, consent or knowledge of Louisiana State officials when she spoke to the press. The Third Circuit concluded that the State of Louisiana should not be deprived of a right to prosecute a criminal offender because of the misconduct of an agent of another state over whom the State of Louisiana had no control. The Court declared:
| ^Furthermore, prosecutorial misconduct does not warrant dismissal of the indictment. The trial judge properly relied on State v. Walker, 567 So.2d 581, 586 (La.1990) in denying the defendant’s motion. In Walker, supra, the Louisiana Supreme Court stated that “to warrant dismissal of an indictment the pros-ecutorial misconduct must be of such a nature as to mislead or unfairly affect the integrity of the grand jury as an independent and unbiased body.” Our Supreme Court further stated “the ultimate issue in a motion to dismiss an indictment on the basis of prosecutorial misconduct is whether the proved misconduct warrants such a drastic remedy. The remedy for prosecutorial misconduct should generally be tailored to the injury suffered from the misconduct.” Id. at 586.
State v. Fontenot, 616 So.2d at 1355-56.
The trial court provided this Court with a per curiam, a copy of the State’s writ application, a transcript of excerpts of Mr. Burns’ testimony on October 23-24, 2000 (with certain testimony highlighted), and the defendant’s motion for a bill of particulars with number 6 highlighted (“Does the State intend to use any objects, materials and/or substances as evidence against the defendant?”). Quoting from the statement of facts and referencing other sections of the State’s writ application, the trial court pointed out that Mr. Bums described what he found in the uniform pants pocket as two napkins. The court then quoted from Mr. Burns’ testimony at the contempt hearing to show that there Mr. Burns testified that he found a wad of napkins in the uniform pants pocket. The court quoted Mr. Burns’ testimony that he could feel something in the pants and thought it was a wad of cash. The trial court then declared: “The napkins were suppressed pursuant to Louisiana Code of Criminal Procedure Articles 718(2)(3) and 729.5(A).”
La.C.Cr.P.art. 718 provides:
Subject to the limitation of Article 723 [state reports and other matters not subject to disclosure], on motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect, copy, examine, test *666 scientifically, photograph, or otherwise reproduce books, papers, documents, photographs, tangible |1sobjects, buildings, places, or copies or portions thereof, which are within the possession, custody, or control of the state, and which:
(1) are favorable to the defendant and which are material and relevant to the issue of guilt or punishment, or
(2) are intended for use by the state as evidence at the trial, or
(8) were obtained from or belong to the defendant.
The court may determine whether evidence is subject to the provisions of Paragraph (1) hereof by in camera inspection.
La.C.Cr.P. art. 729 provides:
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
B. In addition to the sanctions authorized in Part A hereof, if at any time prior or subsequent to final disposition the court finds that either the state through the district attorney or assistant district attorney or the defendant or his counsel has willfully failed to comply with this Chapter or with an order issued pursuant to this Chapter, such failure shall be deemed to be a constructive contempt of court.
Both the State and the defendant are under an obligation, if they discover additional evidence which is subject to discovery, to “promptly notify the other party and the court of the existence of the additional evidence, so that the court may modify its previous order or allow the other party to make an appropriate motion for additional discovery or inspection.” La. C.Cr.P. article 729.3; State v. Strickland, 398 So.2d 1062 (La.1981); State v. McPherson, 630 So.2d 935 (La.App. 4th Cir.1993).
|19In its application the State noted that the trial court had not mentioned that the two napkins had been suppressed for discovery violations based on a lack of notice, and it argued that any surprise would be avoided because the trial had been reset for January 9, 2001. The trial court has now stated that it suppressed the napkins under the discovery articles, La.C.Cr.P. art. 718 and 729.5(A).
Louisiana’s discovery rules “are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence,” and when the defendant “is lulled into a misapprehension of the strength of the state’s case through the prosecution’s failure to disclose timely or fully,” basic unfairness may result.
State v. Brazley, 97-2987, p. 2 (La.9/25/98), 721 So.2d 841, 842, quoting from State v. Allen, 94-2262, p. 4 (La.l 1/13/95), 663 So.2d 686, 688 (citations omitted). Mistrial is only one of several remedies provided by La.C.Cr.P. art. 729.5 for discovery violations; a trial court may also grant a continuance or prohibit introduction of the evidence not disclosed in a timely manner. Id. It is within a trial court’s discretion to exclude evidence or enter any appropriate order to remedy a party’s violation of a discovery right. State v. Bourque, 96-0842 (La.7/1/97), 699 So.2d 1, cert. denied, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998).
In State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997), the focus was on the State’s late disclosure of a brown paper bag containing documents and objects and its failure to provide the 911 log. When the brown bag was produced in the middle of trial, the defendant moved for a mistrial. The court denied the mistrial and gave the defense a couple *667 of hours to assess the bag. Defense counsel then announced that he needed to call additional witnesses and the trial court accommodated counsel. On review, the Supreme Court stated that the defendant failed to show that the had suffered any prejudice as a result of the belated release of the bag and its contents. A trial | ^court's decision is usually reviewed on appeal after conviction. However, the posture of the case at bar is different.
The cases referencing La.C.Cr.P. art. 729.5 involve discovery violations that prejudiced the defendant because of the lack of notice or delayed notice, which prevented the defendant from having adequate time to prepare his defense. .Trial courts have decided to grant a mistrial, to exclude the evidence, or grant a continuance during which the defense could be prepared. On appeal, this Court has had to decide whether the trial court’s decision was correct and whether the defendant was prejudiced. Trial courts generally do not grant a mistrial and then exclude the evidence from the next trial in the matter. Generally, La.C.Cr.P. art. 729.5(A) is intended to prevent the defendant from being surprised by evidence not turned over by the State, which violate discovery rules, so that the defendant may have a fair trial.
Here, in the middle of testimony, the trial court granted a mistrial apparently based on the fact that Sgt. Ray pulled the napkins, which had not been turned over to the defense as evidence, from the defendant’s uniform pants in front of the jury. The State correctly argues that the surprise to the defense would not occur at the January 2001 trial. Also, in the October 25, 2000 transcript, the trial court declared that the motion for discovery violations was moot and set a new trial date on January 9, 2001.
However, the trial court is utilizing the sanction provisions of La.C.Cr.P. art. 729.5(A) for failure to comply with the discovery rules, including entering “any such other order, other than dismissal, as may be appropriate.” In light of the trial court’s per curiam, we find that the trial court did not abuse its discretion by sane-tioning the State for willful failure to coin-ply with discovery procedures in its |?1ruling that the evidence (the napkins found in the uniform pants pocket) would be excluded from the subsequent trial (after declaring a mistrial).
Here the trial court tailored the remedy to the injury suffered by the defendant. The trial court suppressed the napkins, whose alleged discovery involved the misconduct of the prosecutor (according to the trial court). It would be most difficult for this Court to reverse the trial court’s credibility call as to Mr. Burns’ testimony and its decision to prevent Mr. Burns from using the napkins at trial. We decline to do so.
Further, we see no harm done by the trial court’s decision to exclude the napkins because, obviously, at previous trials the State was prepared to proceed and in fact did proceed without their contemplated or actual use as evidence. If, as the State contends, their discovery was truly accidental, occurring during the middle of trial, how can an appellate court say that the trial court abused its discretion by excluding their use at a subsequent trial in light of the extraordinary circumstances explained above? We find that we cannot say this. Therefore, we find that the trial court did not abuse its discretion in making this decision.

CONCLUSION

For the foregoing reasons, this writ application is hereby denied.

WRIT DENIED.

MURRAY, J., concurs.

. The prosecutor's lather, who was a spectator in the courtroom, was also found in contempt and sentenced to two hours in jail.

. Subsequently, the trial court held a contempt hearing and found Lionel Burns in contempt of court. In emergency writ 2000-K-2516, the State sought relief and a stay order. On November 17, 2000 this Court granted a stay. On the same date, the State filed another emergency writ when its motion to recuse was denied. On November 17, 2000, in writ 2000-K-2510 this Court denied the writ.