MAX N. TOBIAS, JR., Judge.
11 Leonard Cushenberry appeals his convictions and sentences for attempted armed robbery, home invasion, and second degree battery, raising three assignments of error. Finding no merit to his assignments, but finding errors as to two of Mr. Cushenberry’s sentences, we affirm his convictions for all three crimes and his sentence on the charge of attempted armed robbery, but remand the case for a ruling on his motion to reconsider the battery and home invasion sentences.
STATEMENT OF THE CASE AND FACTS
The state filed a bill of information on 1 August 2012, charging Leonard Cushen-berry with one count each of armed robbery, home invasion, and second degree battery.[1] Mr. Cushenberry entered not guilty pleas to all charges at his arraignment two days later. He filed various motions on 14 August 2012, including a motion for discovery and inspection. On 14 November 2012, at the conclusion of a two-day trial, a twelve-person jury found Mr. Cushenberry guilty as charged of home invasion and second degree battery, *780 and guilty of the ^responsive verdict of attempted armed robbery. The court denied his motions for new trial and for post-verdict judgment of acquittal on 9 January 2013. The court then sentenced Mr. Cush-enberry to serve five years at hard labor without benefit of parole, probation, or suspension of sentence for the second degree battery conviction; twenty years at hard labor for the home invasion conviction; and thirty years at hard labor without benefit of parole, probation, or suspension of sentence for the attempted armed robbery conviction, the sentences to run concurrently. The state filed a multiple bill as to the attempted robbery conviction, and Mr. Cushenberry filed motions to reconsider sentence and for an appeal. On 25 February 2013, the court held the multiple bill hearing, adjudicated Mr. Cushen-berry a fourth offender, and sentenced him to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
At trial, pursuant to the parties’ stipulation, the state played a tape of the victim’s 911 call that was received on 17 September 2011 at 7:22 a.m.
Officer Byran Rice testified that on the morning of 17 September 2011, he was dispatched to Ochsner Baptist Hospital to meet with Marco Avila, who had sustained an injury to his eye. After speaking with Mr. Avila, he determined that Mr. Avila had been injured at approximately 11:30 the night before at his apartment located at 9122 Dixon Street in New Orleans. Officer Rice testified that Mr. Avila had a swollen left eye, with a broken orbital bone around his eye, and he appeared to be in pain. Officer Rice stated that Mr. Avila identified his attacker as “Cushenberry,” whose nickname was “Two.” The officer went to Mr. Avila’s apartment and discovered that the door had been forced open; the dead bolt on the door was still engaged, and the door had been secured with a 2x4 that had been screwed into the molding, which had been ripped away from the wall. Officer |aRice also noticed droplets of blood inside the apartment on the bed sheets and the floor. He found no contraband inside the apartment. He identified photographs of the apartment and of Mr. Avila that showed his injuries.
Officer Rice testified that when he was on patrol the next day in the neighborhood where Mr. Avila was attacked, he received a broadcast from Detective Ryan Vaught, who was the lead investigator of the attack on Mr. Avila. Detective Vaught radioed that he was in pursuit of Leonardo Cush-enberry. Officer Rice saw Mr. Cushen-berry emerge from between two houses on Hollygrove Street, but he was able to see Mr. Cushenberry only from the waist up because of a line of parked cars between them. Officer Rice stated that when Mr. Cushenberry saw him, he dropped his hands to his side. The officer exited his car and ordered Mr. Cushenberry to the ground. As Mr. Cushenberry complied, Detective Vaught arrived at the scene. As they both handcuffed Mr. Cushenberry, he stated: “That dude lied on me.” Officer Rice stated that although they seized nothing from Mr. Cushenberry’s person, they found a rusty black-handled fixed-blade knife near him. They then transported him to Central Lockup.
On cross-examination, Officer Rice testified that he and Detective Vaught called for crime lab personnel to go to Mr. Avila’s apartment once they arrived there. He stated that the police did not seize a saw or a baseball bat, but he did not remember seeing either one of them at the apartment. After being shown a photograph of the inside of the apartment, Officer Rice testified that he did not direct anyone to try to take fingerprints from a sheetrock knife/saw that was lying on the floor of the *781 apartment. He stated that although he directed crime lab personnel to try to get fingerprints from the door area, he did not ask them to swab |4for DNA material. He admitted that when the officers searched Mr. Cushenberry, they did not find any money, Mr. Avila’s wallet, or any cocaine.
Dr. Eric Sundell, qualified by stipulation as an expert in emergency medicine, testified that he treated Mr. Avila at Ochsner Baptist Hospital’s emergency room on 17 September 2011. Mr. Avila indicated that he had been punched in the face and had been rendered unconscious. Dr. Sundell described Mr. Avila’s injuries as a swollen left eye with a cut around it. He stated that a CAT scan revealed a fractured bone to the orbit (eye socket), all around the bottom of the left eye and in four areas of the eye wall, as well as a possible fracture of the septum. He saw bleeding in the lining of Mr. Avila’s eye. He stated that Mr. Avila also had a concussion. He opined that a person who sustains a broken bone typically feels pain. He treated and released Mr. Avila that day, sending him home with prescriptions for antibiotics and painkillers.
On cross-examination, Dr. Sundell testified that his diagnosis of a concussion was based on Mr. Avila’s statement that he was unconscious for a short time; the doctor indicated that no lab test would indicate a concussion. He repaired a one-half centimeter cut to Mr. Avila’s eye with medical super glue. He stated that there was no mention of any alcohol consumption in Mr. Avila’s medical records, which he identified. On redirect, after reading the records, Dr. Sundell stated that there was no evidence of intoxication noted in the summary of the examination, the history provided by Mr. Avila, or the results of tests of his vital signs. On re-cross, Dr. Sundell stated that evidence of cocaine use usually dissipates quickly, within one or two hours, in the body.
Marco Avila testified that he emigrated to the United States from Mexico in 1988. He admitted that he had a DWI conviction in Houston from 1999 and a ^disturbing the peace conviction in New Orleans from 2006, which was based on his drinking in public. He stated that in 2011, he lived in an apartment at 9122 Dixon Street and worked in construction. On 16 September 2011, he performed demolition work in the morning and then received a paycheck. He testified that his boss took him to cash his check, which was for $300, and then took him to the supermarket to buy some groceries. While there, he also purchased a twelve-pack of beer. Once home, he drank some of the beer while cooking, and then around 4:00 p.m. he left his apartment to go to his friends’ house, taking some beers with him in a backpack as well as $20; he testified that he left the rest of his money at home.
Mr. Avila admitted that the house where he was going was a house where he and his friends smoked crack cocaine. He estimated that in 2011, he normally smoked crack cocaine approximately once every two weeks, and he often saw Mr. Cushen-berry at the house when he was there. He stated that on this occasion, he left when he saw that Mr. Cushenberry, whom he did not consider to be a friend, was already there. He stated that he returned home and drank more beer. At approximately 10:00 p.m. that night, after he had ingested a total of ten to twelve beers, he left his apartment again. He stated that he ran into Mr. Cushenberry and another man, from whom he bought two little bags of crack cocaine for $20, the only money that he had with him. He stated that Mr. Cushenberry asked him to give him one of the bags, but he refused and returned home.
*782 Mr. Avila testified that because he did not have anything with which to smoke the cocaine, he planned to go to a friend’s house to do so. Instead, he heard a knock on his door and heard Mr. Cushenberry call out, “Amigo,” the name that Mr. Cush-enberry called him. He stated that he told Mr. Cushenberry to go away | fiand not to bother him. Instead, he then heard a loud noise, and when he turned around, he saw that Mr. Cushenberry had entered his apartment. He stated that Mr. Cushenber-ry punched him in the face. Mr. Cushen-berry was also armed with a large knife. Mr. Avila testified that he fell to the floor, and Mr. Cushenberry told him to give him the drugs. He handed Mr. Cushenberry the cocaine that he had in his pocket. Mr. Cushenberry then asked him for money, and Mr. Avila pointed to money that was lying on the table. He stated that out of the $300 from his paycheck, he had spent money for groceries and for the crack cocaine, and he had one $100 bill and four $20 bills on the table. Mr. Cushenberry took the money and left.
Mr. Avila testified that after being hit in the head, it felt like his head was exploding; he had a lot of pain in his face. Mr. Avila went into the bathroom to wash his face, and it felt like he had broken bones in his face. He heard steps on the driveway, and he remembered that his roommate had a baseball bat in the living room by the door. He retrieved the bat and went to his bedroom, where he saw Mr. Cushen-berry trying to push through the wall. Mr. Cushenberry left when he saw Mr. Avila with the baseball bat. Mr. Avila testified that because his cell phone had no remaining minutes, he stayed inside his apartment, watching the door, until daylight because he was afraid that Mr. Cush-enberry was outside. He testified that at daybreak, he walked to a nearby gas station and called 911. An ambulance picked him up from the gas station and took him to the hospital.
Mr. Avila identified several photographs that the police had taken of his apartment, including one that showed the door through which Mr. Cushenberry had entered. He stated that he had sealed that door with a deadbolt and a 2x4 that he screwed into the door frame, and he could not open the door from the inside 17because of the 2x4. He realized that his money was missing from the table when he left to call the police. When police officers interviewed him at the hospital, he told them that Mr. Cushenberry broke into his house and punched him in the face; he did not tell them about the cocaine because he was ashamed and afraid that he would get into trouble. He viewed a photo lineup in the hospital from which he chose Mr. Cushenberry’s photo, and he wrote on the back of the lineup photo: “He broke into my room and punched me in the left eye, pulled a knife, and demanded for [sic] money.” He stated that a detective returned the next day with a photo of a knife, which he identified as the knife that Mr. Cushenberry had during the robbery. Mr. Avila positively identified Mr. Cushen-berry as the man who broke into his apartment, punched him in the eye, and stole his money and cocaine.
On cross-examination, Mr. Avila testified that although he drank ten beers that day, he did not have an opportunity to smoke the crack cocaine. He stated that he had known Mr. Cushenberry since he moved into the neighborhood in 2008, and he smoked crack cocaine with Mr. Cushenber-ry approximately five times; he did not recall telling an assistant district attorney that he smoked crack with Mr. Cushenber-ry ten to twelve times. He testified somewhat vaguely concerning an incident involving a bike in August 2009 wherein he *783 and Mr. Cushenberry were arrested together.
Concerning his 911 call after the robbery, Mr. Avila testified that he did not remember telling the 911 operator that $300 was stolen, but he remembered saying that his wallet and paycheck were taken. He stated that the 911 operator did not ask him who robbed him, but he gave this information to Detective Vaught. He stated that he also told the detective that Mr. Cushenberry took $180, returned to the apartment, and tried to enter a second time. At that time he armed himself with lathe baseball bat. He admitted that he did not tell the prosecution about the cocaine until later. He stated that although no charges were pending against him at the time of trial, the prosecutors told him that he might face charges.
On re-direct, Mr. Avila admitted that he bought crack cocaine that day. He stated that at the time of the offense he did not know Mr. Cushenberiy’s first name. He denied swinging a sheetrock saw at Mr. Cushenberry during the attack.
Detective Ryan Vaught was the detective in charge of the investigation. He met with Mr. Avila at the hospital on the day after the robbery. He testified that Mr. Avila’s eye was red, bleeding, and swollen. Mr. Avila related what happened and identified his attacker as “Cushenber-ry,” whose nickname was “Two.” Mr. Avila told him that he knew his attacker from the neighborhood. Detective Vaught relayed this information to another officer, who compiled a lineup that contained Mr. Cushenberry’s photo. Mr. Avila viewed the lineup and identified Mr. Cushenber-ry’s photo as that of his attacker. After this identification, the detective went to Mr. Avila’s apartment. He found the door ajar, and it appeared to have been forced open. He found blood on the floor, the bed, and the sheets. He identified various photographs, including one that he indicated showed a kick mark at the bottom of the door. He also identified another photo that showed the interior of the door frame with screws and nails that had secured the door to the wall. Another photograph showed the door jamb, which was cracked where the dead bolt and latch would normally rest. Yet other photographs showed that the door had been forced in and that a 2x4 had been nailed across the back of the door. He stated that they found no contraband or drug paraphernalia in the apartment.
Detective Vaught testified that he obtained an arrest warrant for Mr. Cushen-berry, and the next day he went to the Hollygrove area to see if he could |alocate him. He noticed Mr. Cushenberry standing at the corner of Hollygrove and Peach Streets, and when Mr. Cushenberry saw the detective, he ducked behind a stack of wooden pallets. Detective Vaught stopped his car and shouted to Mr. Cushenberry, who ran. He broadcast his description and asked for backup. He stated that he began running toward where he thought Mr. Cushenberry was headed, and another officer radioed that he saw him emerge from between two houses. Detective Vaught heard yelling and followed the sound to where he saw Officer Rice and Mr. Cushenberry, who was on the ground. As the officers handcuffed him, Mr. Cush-enberry stated that the other man lied on him. After Mr. Cushenberry was handcuffed, the detective informed Mr. Cushen-berry that he was under arrest for armed robbery. After putting Mr. Cushenberry in the back of a police unit, the officers found a fixed-blade, black-handled knife inches from where he was apprehended.
Detective Vaught testified that he took Mr. Cushenberry to the police station, where he formally advised him of his Miranda rights. After indicating that he *784 understood his rights and signing and initialing a waiver of rights form, Mr. Cush-enberry gave a recorded statement, which was played for the jury.
In his statement, Mr. Cushenberry explained that his statement at his arrest, that the “dude lied on him,” referred to someone he called “Migo,”[2] who lived in the neighborhood. He insisted that the incident was merely a drug deal “gone bad,” and he maintained that the whole neighborhood knew the truth about the incident. He stated that Migo had sent someone to get crack for him, but that person did not return. Mr. Cushenberry stated that he was at the house of Paul and |inTommy, who live on Marks Street, and Migo came up and told Tommy that he wanted to buy some crack cocaine. Mr. Cushenberry stated that Migo indicated that he had only a $100 bill and needed to get change. Mr. Cushenberry told Migo that he would find someone who would sell him cocaine. After Migo got change for the $100 bill, the two men ran into someone named Dave, who sold Migo crack cocaine. Instead of returning to Paul and Tommy’s house, Migo took the cocaine back to his apartment.
Mr. Cushenberry told Detective Vaught that he went to Migo’s apartment and knocked on his door. Migo told him to get away from the door, and then Migo opened the door and came outside. Mr. Cushen-berry stated that all he wanted to do was get some cocaine from Migo to get high. Instead, Migo began talking “crazy,” and Mr. Cushenberry lost his temper and punched Migo, who then fell through the door, taking Mr. Cushenberry with him. He insisted that they were outside the apartment when he hit Migo, and he only hit Migo with his fist. He denied taking Migo’s money or pulling a knife. He stated that Migo lost his money through smoking cocaine with a woman named Troy; he did not know if Troy was a prostitute, but he invited the detective to ask Tommy and Paul about her. He described Tommy and Paul as the only “white” guys at the corner of Marks and Hollygrove Streets. He denied that Tommy and Paul sold drugs, but they sometimes got high. Mr. Cushenber-ry stated that he went back to their house after he punched Migo and told them what happened. He told the detective that although he punched Migo sometime between 10:00 and 11:00 p.m., Migo probably did not contact the police until “God knows when.”
In the statement, Detective Vaught asked Mr. Cushenberry why he ran when he saw the detective, and Mr. Cushenberry replied that he was not ready to go to Injail. When Detective Vaught told him that he would be “taking the ride today for armed robbery,” he replied:
“Man, I’m in a world of trouble. It’s going to look like it too. I understand that but I’m not that stupid to actually rob that man at knife point and just kick in the door or something. Ain’t no telling what Migo’ did? I know he did hit the door when I hit him, I fell too. But the whole door [sic] off the hinges. I don’t know what he did. He was in there all night smoking crack.”
Mr. Cushenberry then asked if anyone had gotten a reward for his capture, but Detective Vaught responded that he was the one who found him, and he could not get a reward. Mr. Cushenberry then told the detective that no one from the neighborhood called because they all knew that the charges were false.
*785 After playing the recording of Mr. Cush-enberry’s statement, the state resumed its examination of Detective Vaught. He indicated that Mr. Cushenberry’s statement was not consistent with the condition of the broken door at Mr. Avila’s apartment, in that the door had been secured with the 2x4 inside the doorjamb. Detective Vaught denied knowing about any Crimes-topper tip or news release concerning the robbery. He stated that after seizing the knife at Mr. Cushenberry’s arrest, he showed a photo of it to Mr. Avila, who identified it as the knife that Mr. Cushen-berry brandished during the attack.
On cross-examination, Detective Vaught admitted that he did not know what Mr. Avila did between the time of the attack and when he called the police. He stated that Mr. Avila told the detective that he and his assailant had been in jail together. Mr. Avila mentioned nothing about cocaine or using it with Mr. Cushenberry in the past. The detective admitted that there was no indication in his report about Mr. Cushenberry leaving and then returning to Mr. Avila’s apartment, but he stated that this information was in Officer Rice’s report. He stated that Mr. Avila told him that Mr. Cushenberry took the money out of his pocket, not off of the dresser or the table. He stated that Mr. | ^Avila told him that Mr. Cushenberry stole $180, not $800; he mentioned nothing about a paycheck or his wallet. He also was unsure if Mr. Avila told him that he had consumed twelve beers or was intoxicated. Detective Vaught stated that he was unaware that the police department published a news release about the robbery on the afternoon after it occurred, and he stated that officers are not told if Crimestoppers offers a reward for information concerning a case. He stated that he did not remember Mr. Cushenberry telling him that Mr. Avila “got up in his face” before he hit Mr. Avila;[3] he stated that Mr. Cushenberry said that Mr. Avila cursed at him. Detective Vaught testified that he spoke to neither Tommy nor Paul, nor did he find a woman named Troy. He stated that he did not listen to the 911 call. He admitted that there was no evidence that Mr. Cush-enberry used the knife on Mr. Avila. He did not direct crime lab personnel to seize the sheetrock saw that was on Mr. Avila’s floor because it was one of the tools that Mr. Avila used in his work. When he was shown Officer Rice’s report, he agreed that it did not contain any mention of Mr. Avila giving the denominations of the money taken from him, and he stated that this information must have been in Officer Rice’s initial report.
On redirect, Detective Vaught identified Officer Rice’s initial report, which set forth the denominations of currency taken from him. The narrative of that report also mentioned that Mr. Cushenberry returned to Mr. Avila’s apartment, Mr. Avila armed himself with a baseball bat, and Mr. Cush-enberry then left. Detective Vaught agreed that Mr. Cushenberry neither mentioned in his statement that Mr. |1sAvila attacked him with the sheetrock saw, nor indicated that Mr. Avila came out of the house, screaming that three is a crowd. Detective Vaught testified that he did not know if Troy was a prostitute.
The state recalled Officer Rice, and over defense objection, he testified that Mr. Avila told him that when Mr. Cushenberry returned, he armed himself with a baseball bat, and Mr. Cushenberry ran away.
At this point, the jury retired for lunch, whereupon considerable argument concerning alleged discovery violations by the state occurred, which comprises one of the assignments of error raised in this appeal.
*786 Once the jury returned, the state called Deputy Don Hancock, a telephone supervisor for the Orleans Parish Sheriffs Office. Deputy Hancock described the method by which inmate calls are made and recorded, including the fact that each inmate must give his folder number as a pin number for making calls. He testified that he compiled a CD of two calls placed by Mr. Cushenberry, one on 18 September 2011 when he was booked into Central Lockup, and one on 1 October 2011. The state then played the recording of the two calls. In the first recording, the person to whom Mr. Cushenberry made his call (possibly Paul) asked him if he wanted him to talk with “this guy” (meaning the victim), and then the man stated that he was going to call “a guy” he knew to see if that person could get the victim to retract and recant his statement. In the second one, Mr. Cushenberry told a person on the line to go to someone’s house and get something from behind the sheetrock because he could not use it. He then told another person that if he ran into “Migo,” he should see what was happening with him.
The state rested, and the defense called no witnesses and rested.
11 .DISCUSSION

Errors Patent

A review of the record reveals several errors patent.[4] We find errors in the sentences imposed for both the second degree battery and home invasion counts. With respect to the battery, La. R.S. 14:34.1 provided at the time of the offense for a sentence of up to five years, but it did not prohibit the eligibility of parole, probation, or suspension of sentence. The court imposed the sentence on this count without these benefits. Thus, this sentence is illegally harsh. By contrast, the court imposed an illegally lenient sentence for the home invasion count because it failed to impose at least five years of the sentence without benefit of parole, probation, or suspension of sentence and failed to impose a fine of at least $5000, as mandated by La. R.S. 14:62.8, as it existed at the time of the offense. See State v. Hart, 10-1614, p. 4 (La.App. 4 Cir. 11/2/11), 80 So.3d 25, 28-29.
Normally, this court would amend the battery sentence, by deleting the prohibitions on parole, probation, or suspension of sentence, and remand the home invasion count for the imposition of a fine and the mandatory benefit prohibitions. However, the final patent error mandates that this court remand the matter with respect to those two counts. Mr. Cushen-berry filed a motion to reconsider sentence on 9 January 2013, the date of the original sentencing. The record on appeal indicates no ruling on that motion. The failure of a trial court to rule on a motion to reconsider sentence requires that the case be remanded for a ruling and that | ^appellate review of Mr. Cushenberry’s sentences only be deferred. See State v. Peters, 10-0326, p. 4 (La.App. 4 Cir. 2/16/11), 60 So.3d 672, 675. Thus, we must remand for a ruling on the motion to reconsider the home invasion and battery sentences. The original sentence for the attempted armed robbery conviction no longer exists because Mr. Cushenberry was adjudicated a fourth offender and re-sentenced to life imprisonment on that *787 count; thus, there is no need to remand for re-sentencing on that count.

Assignments of Error

I.
Because Mr. Cushenberry asserts a want of sufficient evidence to uphold two of his three convictions, we discuss his third assignment of error first.[5] In his third assignment, Mr. Cushenberry contends that the state failed to present sufficient evidence to support his attempted armed robbery and home invasion convictions; he admits that he hit the victim and does not dispute his second degree battery conviction. His argument is based on his assertion that the victim’s testimony was so contradictory as to what he told various officers that it was not credible to prove that he entered the victim’s home and stole his money and cocaine.
When reviewing a claim of insufficiency of evidence, the appropriate standard was set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the court must determine whether the evidence, viewed in the light most favorable to the prosecution, “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). See also State v. Broion, 03-0897 (La.4/12/05), 907 So.2d 1; State v. Veal, 12-0712 (La.App. 4 Cir. 5/1/13), 116 So.3d 779, writs denied, 13-1237, 13-1266 (La.12/2/13), 126 So.3d 498; State v. Batiste, 06-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810. If the state uses circumstantial evidence to prove the elements of the offense, “La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’ ” State v. Neal, 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657. See also Brown, supra; Veal, supra; Batiste, supra.
Mr. Cushenberry was charged with, and convicted of, home invasion, which is defined by La. R.S. 14:62.8, in pertinent part, as “the unauthorized entering of any inhabited dwelling, or other structure belonging to another and used in whole or in part as a home or place of abode by a person, where a person is present, with the intent to use force or violence upon the person of another.... ” See State v. Smith, 13-0143 (La.App. 4 Cir. 5/21/14), 141 So.3d 853; State v. Spells, 12-1148 (La.App. 4 Cir. 5/29/13), 116 So.3d 1011, writ denied, State ex rel. Spells v. State, 13-1747 (La.2/14/14), 132 So.3d 405. He was also charged with armed robbery, but was convicted of attempted armed robbery. La. R.S. 14:64 defines an armed robbery as: (1) the taking, (2) of anything of value, (3) from a person or in the immediate control of another, (4) by the use of force or intimidation, (5) while armed with a dangerous weapon. See State v. Robinson, 11-0066 (La.App. 4 Cir. 12/7/11), 81 So.3d 90. An attempt is defined by La. R.S. 14:27 as occurring when “[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the | i7accomplishing of his object ... and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.”
Mr. Avila’s testimony was sufficient to establish both offenses. He testified that Mr. Cushenberry broke down his door, punched him in the face, and stole his money while armed with a knife. Mr. Cushenberry contends, however, that Mr. Avila’s testimony was so contradictory to what he told various police officers that *788 the jury could not have believed it. A fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 09-0259, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 211; State v. Huckabay, 00-1082, pp. 32-33 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111.
In support of his claim, Mr. Cushenber-ry cites to several inconsistencies between Mr. Avila’s testimony and his statements to police officers, mostly concerning where he was when the defendant arrived at his house; whether the money was taken from his pocket or from the table or dresser; how much money and what other items were taken from him; and whether crack cocaine was involved.
Mr. Cushenberry first points to Mr. Avila’s statements to the 911 operator, arguing that Mr. Avila told the operator that he did not know who robbed him. However, Mr. Avila told the operator that the perpetrator was a black man from his neighborhood, and he repeatedly referred to his assailant as a criminal. He stated that he was in bed when he heard the perpetrator enter his apartment and that the perpetrator hit him in the face and then took his money and his paycheck. Although he mentioned his wallet, he also told the operator that he did not carry a wallet.
lisMr. Cushenberry then points to differences in what the officers testified Mr. Avila told them and what Mr. Avila testified to at trial. These discrepancies included the following: Mr. Avila’s failure to mention that the defendant also stole his cocaine; his failure to tell the 911 operator or Detective Vaught that the defendant returned to the apartment and was chased away when Mr. Avila armed himself with a bat; and the amount of money that was actually stolen, given what Mr. Avila said he was paid and how much he spent before being robbed. With respect to the failure to mention the cocaine, Mr. Avila explained that he was afraid to tell the police about the cocaine because he feared he would get in legal trouble. His failure to tell the 911 operator, hours after the robbery, that the assailant returned, or his failure to tell Detective Vaught this fact, did not prove that it did not happen. The defendant also asserts that Mr. Avila did not inform Detective Vaught that he and the defendant went to jail together (apparently during the 2009 incident to which Mr. Avila testified). However, Detective Vaught testified that Mr. Avila told him this fact.
Mr. Cushenberry theorizes that Mr. Avila manufactured the entry and robbery in retaliation for the defendant punching him. However, as noted by the officers, the only blood spots were found inside Mr. Avila’s apartment, not outside where Mr. Cushen-berry said he hit Mr. Avila. The defendant theorizes that the door to the apartment broke open when he hit Mr. Avila, and they both fell through the door. He also asserts that there was no evidence that the door was not broken before he hit Mr. Avila or that Mr. Avila did not break down the door himself after the defendant left. His theory, however, does not explain the kick mark that was on the bottom of the door and is memorialized in at least one of the photographs |;9taken by crime lab personnel the morning after the robbery; this kick mark corroborates Mr. Avila’s testimony.
Mr. Cushenberry next argues that Mr. Avila was too intoxicated, with beer and the crack cocaine that he bought, at the time that the defendant punched him to remember clearly what happened. He points to Officer Rice’s initial report, which under the heading “sobriety” lists “alcohol.” Mr. Avila, however, testified that he did not have the opportunity to *789 smoke the cocaine before Mr. Cushenberry stole it. Mr. Cushenberry disputes Mr. Avila’s claim that he was too scared to leave to call the police, noting that Mr. Avila claimed to have chased Mr. Cushen-berry away with the baseball bat when he returned after the robbery. He argues that the only evidence that the state presented to prove that a home invasion and robbery occurred was Mr. Avila’s own testimony. However, the testimony of a single witness in many instances, if believed by the trier of fact, is sufficient to support a finding of guilty. State v. Sippio, 13-0206, pp. 2-8 (La.App. 4 Cir. 1/30/14), 133 So.3d 294, 296. As noted by this court in State v. Wells, 10-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306:
Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244 (La.App. 4[th] Cir.1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938 (La.1984).
The jury here was made aware of the discrepancies between Mr. Avila’s testimony and what he told various law enforcement officers, and it found his testimony more credible than the theory presented by the defense. The evidence 1 ¡^adduced at trial does not show that this finding was contrary to the evidence. Thus, we find the state presented sufficient evidence to support the defendant’s convictions for home invasion and attempted armed robbery; indeed, it was sufficient to find him guilty as charged of armed robbery. This assignment of error is meritless.
II.
In his first assignment of error, Mr. Cushenberry contends that the trial court erred by denying his motion for mistrial based upon the state’s untimely production of discovery material. Specifically, he alleges that the state withheld two items that impinged upon his counsel’s ability to present a consistent, coherent defense: (1) a photograph of the door showing the broken 2x4 that had been securing it, which the state produced a few days before trial began; and (2) the initial police report, which was produced during trial.
La.C.Cr.P. art. 718, both as it existed at the time of the offense and presently, provides, in pertinent part, that a defendant is entitled to discover any documents or photographs that are in the state’s custody and that “are favorable to the defendant and material to the issue of guilt or punishment,” or “are intended for use by the state as evidence at the trial.” The state intended to use the photograph to show the damage to Mr. Avila’s door, which had been reinforced by the 2x4. The incident report contained information that the door had been sealed with a 2x4, as well as information concerning the defendant’s return to the apartment after the robbery, Mr. Avila arming himself with the bat, and the denominations of the money taken during the robbery. The state did not argue that these items were not discoverable.
| ^La.C.Cr.P. art. 729.5 sets forth the sanctions for failure to comply with the discovery articles:
A. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this Chapter or with an order issued pursuant to this Chapter, the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on *790 motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate.
B. In addition to the sanctions authorized in Part A hereof, if at any time prior or subsequent to final disposition the court finds that either the state through the district attorney or assistant district attorney or the defendant or his counsel has willfully failed to comply with this Chapter or with an order issued pursuant to this Chapter, such failure shall be deemed to be a constructive contempt of court.
See State v. Ray, 423 So.2d 1116 (La.1982); State v. Lee, 00-2429 (La.App. 4 Cir. 1/4/01), 778 So.2d 656.
In State v. Brazley, 97-2987, pp. 2-3 (La.9/25/98), 721 So.2d 841, 842, the Court summarized the pertinent law:
Louisiana’s discovery rules “are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence,” and when the defendant “is lulled into a misapprehension of the strength of the state’s case through the prosecution’s failure to disclose timely or fully,” basic unfairness may result. State v. Allen, 94-2262, p. 4 (La.11/13/95), 663 So.2d 686, 688 (citations omitted).... Nevertheless, mistrial is only one of several remedies provided by La.C.Cr.P. art. 729.5 for discovery violations. The trial court may also in its discretion grant a continuance or may prohibit introduction of the evidence not disclosed in a timely manner. State v. Knighton, 436 So.2d 1141, 1152 (La.1983); State v. Lee, 364 So.2d 1024, 1027 (La.1978).
As noted by the Court in State v. Bourque, 96-0842, p. 15 (La.7/1/97), 699 So.2d 1, 11: “It is within the trial court’s discretion to exclude the evidence or enter any 122other appropriate order to remedy a party’s violation of a discovery right. State v. Seals, 684 So.2d 368, 378 (La.1996).”

The Photograph of the Door

Mr. Cushenberry first argues that the court should have granted his motion for mistrial due to the state’s untimely production of the photograph of the door, which showed that it had been reinforced by the 2x4 and that the force of entry tore the doorjamb from the walls. On the day of trial, the defense filed a motion to exclude the photograph due to the state’s late disclosure of it. According to argument that occurred prior to voir dire, the state produced eleven photographs the day before trial, only one of which the state intended to introduce, that being the one showing the broken doorjamb with the attached 2x4 (Exhibit S-3A). The court denied the motion, noting that while the photograph “more clearly depict[ed] the quote ‘breaking’ quote of a door,” there was no undue prejudice or surprise because the state had produced at least four other photographs that showed the door had been broken. Counsel objected, noting that the new photo showed “something different” from “a different angle.”
Later, when the defense learned of the existence of an initial police report that his counsel was not given (although prior counsel had obtained a copy of it), counsel renewed her argument concerning the photograph. Defense counsel argued that the fact that the door had been braced with a 2x4 was also listed in the initial report, but it was not in either supplemental report by Officer Rice or Detective Vaught. At that point, the court asked counsel if she would have questioned any witness about this, and she replied that she would have questioned Officer Rice and Mr. Avila about the 2x4 on the door. The court responded that counsel knew *791 about the 2x4 on the door prior to her cross-examination of either of [ ¡^these witnesses because the day before trial began she had been given the photograph. Counsel had no reply to this, but she argued further about other information contained in the incident report, and then she requested a mistrial based upon all of the information contained in the initial report. The court denied the motion but allowed counsel to present additional reasons to the court in camera,[6] The defendant argues that the court erred in denying his motion for mistrial based upon the late disclosure of the photograph because the defense was unduly surprised by the 2x4’s existence. He notes that the defense theory was that he did not intend to enter Mr. Avila’s apartment and only did so when he and Mr. Avila fell through the doorway when he hit Mr. Avila. He asserts that he had been lulled into a false sense of the weakness of the state’s case because had he known that the door was reinforced by the 2x4, he would have known that it was unlikely that merely falling into the door would have broken it. He argues that “likely [trial counsel] would have attempted another theory of defense,” but he does not specify what other viable defense counsel could have put forth.
We do not find that the court erred by denying his motion for mistrial based on the late disclosure of the photograph. As noted by the trial court, counsel obtained the photograph prior to the beginning of trial, and, contrary to her argument, she could have cross-examined Mr. Avila and Officer Rice (who authored both the initial report and one of the supplemental reports) about the 2x4. Moreover, while only photo exhibit 3A shows the 2x4, photo exhibits 3E and 3F both show a kick mark on the bottom of the door, belying the defense’s assertion l^that the door broke when he and Mr. Avila fell against it and supporting Mr. Avila’s testimony that the defendant kicked down the door. Given all these facts, Mr. Cushenberry has not shown that the trial court abused its discretion by denying his motion for mistrial based on the late production of the photograph. This portion of this assignment of error has no merit.

The Incident Report

Mr. Cushenberry further argues that the trial court should have granted his motion for mistrial based upon the state’s failure to produce the initial report until counsel became aware of its existence during the examination of Detective Vaught. He contends that this report contained various pieces of information that, had counsel known about them, would have changed the defense presented to the jury. These items, which counsel lists, are: (1) mention of the 2x4 that blocked the door through which the defendant entered Mr. Avila’s apartment; (2) evidence of Mr. Avila’s intoxication; (3) Mr. Avila’s statement to Officer Rice that the defendant returned to the apartment after the robbery and battery, and Mr. Avila grabbed a baseball bat and chased the defendant away from the apartment; and (4) Mr. Avila’s initial statement to Officer Rice about what preceded the battery and robbery, which varied in certain aspects from what he testified to at trial. As with the late disclosure of the photograph of the door, the defendant contends that the information in the report about the 2x4 probably would have changed the defense presented at trial, given the unlikelihood that he and Mr. Avila merely fell through the door when he hit Mr. Avila. In addition, he asserts that *792 he could have used the information about Mr. Avila’s first report of the events preceding the robbery and battery to impeach his testimony, which contained inconsistencies. Mr. Cushenberry notes that the trial court was angered that the state did not turn over 12.5this initial report earlier, and he takes exception to the court’s ultimate finding that the defense was not unduly prejudiced by the very late production of this report.
The trial transcript contains pages of argument on this point, after the state produced the report during its re-direct examination of Detective Vaught and after the jury retired to deliberate. With respect to the information about the 2x4, the court noted that the defense had received the photograph a few days before trial that depicted this. As for the defendant’s “intoxication,” while the initial report listed “alcohol” under the “sobriety” heading, the court pointed out that the defense already knew that Mr. Avila had been drinking and included this fact in its opening statement. The court noted that the information concerning the defendant’s return and Mr. Avila arming himself with the baseball bat was contained in the 911 tape, a copy of which the defense had received. As for Mr. Avila’s recounting of the events that preceded the robbery and battery, the court found that the late production of this information did not unduly prejudice the defendant. The assistant district attorney indicated that the state had produced this report to prior counsel in an earlier ease, but apparently prior counsel did not give trial counsel the report.[7] In denying the mistrial, the court further noted that other documents produced by the state should have signaled to counsel that an initial report existed.[8]
bfiA review of the record supports the trial court’s ruling because all of the information listed by appellate counsel can be found in other documents or photographs that trial counsel received prior to trial. The 2x4 on the door can be seen in the photograph that the state produced a few days before. Evidence of Mr. Avila’s intoxication was known to counsel prior to trial, and counsel apparently referred to it in her opening statement. The allegations that the defendant returned after robbing Mr. Avila and that Mr. Avila armed himself with a baseball bat and drove him away were contained in the 911 tape, a copy of which counsel had prior to trial. Moreover, Mr. Avila’s account of the events preceding the robbery and battery, which are contained in the initial report, are almost identical to the information contained in the affidavit for the defendant’s arrest warrant (a copy of which is contained in the record for case number 508-975). Counsel listed the arrest warrant affidavit in her inventory of items that she received from the state. Thus, counsel was apprised of this account from the affidavit for the arrest warrant. Therefore, the court properly found that the state’s failure to produce to successive counsel the *793 initial report did not unduly prejudice the defendant. The court properly denied the motion for mistrial. This assignment of error has no merit.
III.
By his remaining assignment of error, Mr. Cushenberry contends that the trial court erred by denying his motion for mistrial based on the state’s improper closing argument. He asserts that the state’s argument referred to evidence that was untimely presented, attempted to shift the burden to the defense, and attacked defense counsel. He concludes that the entire state’s rebuttal argument appealed to prejudice, shifted the burden to the defense, and deprived him of his constitutional rights by violating the “rules”.
| a7This court set forth the standard for evaluating a claim of improper closing argument in State v. Augustine, 13-0164, pp. 8-9 (La.App. 4 Cir. 12/4/13), 131 So.3d 109, 115:
As per La.Code Crim. Proc. art. 774, the scope of closing argument “shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” Art. 774 further provides that closing argument “shall not appeal to prejudice,” and the State’s rebuttal argument “shall be confined to answering the argument of the defendant.” A prosecutor should refrain from making personal attacks on defense strategy and counsel. State v. Manning, 03-1982, p. 75 (La.10/19/04), 885 So.2d 1044, 1108 (citing State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660 and State v. Duplessis, 457 So.2d 604 (La.1984)). While jurisprudence has found that prosecutors may not refer to personal experience or turn their argument into a commentary on crime, prosecutors have “wide latitude in choosing closing argument tactics.” State v. Clark, 01-2087, p. 15 (La.App. 4 Cir. 9/25/02), 828 So.2d 1173, 1183. See also State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022.
As noted in [sic] by this court in State v. Jones, 10-0018, p. 9 (La.App. 4 Cir. 11/10/10), 51 So.3d 827, 833:
Even where a prosecutor’s argument has exceeded the scope of art. 774 or is deemed to be improper, a reviewing court should credit the good sense and fair-mindedness of the jurors who have heard the evidence. State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703; Clark; State v. Ricard, 98-2278, 99-0424 (La.App. 4 Cir. 1/19/00), 751 So.2d 393. In addition, “a reviewing court will not reverse a conviction unless thoroughly convinced that the argument influenced the jury and contributed to the verdict.” Clark, at p. 15, 828 So.2d at 1173. See also State v. Draughn, 2005-1825 (La.1/17/07), 950 So.2d 583; Casey; State v. Wiltz, 2008-1441 (La.App. 4 Cir. 12/16/09), 28 So.3d 554. As the Court noted in Draughn: “Mistrial is a drastic remedy, and the determination of | ^whether prejudice to the defendant has resulted from the prosecutor’s comments lies in the sound discretion of the trial judge. State v. Leonard, 2005-1382 p. 11 (La.6/16/06), 932 So.2d 660, 667. Moreover, a trial judge has broad discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981).” Draughn, at p. 44, 950 So.2d at 614. [Emphasis added by this court in Augustine.]
The defendant first points to the prosecutor’s reference during the initial closing *794 argument to the photograph showing the broken door with the 2x4, arguing that this was a reference to improperly admitted evidence. However, as discussed above, the court properly allowed the state to admit the photograph.
The defendant next refers to the statements by the prosecutor during rebuttal argument that he alleges were attacks on his counsel. Apparently during her closing argument, defense counsel referred to a statement made during the defendant’s phone call that he made when he was booked. In the call, the recipient stated that he would contact someone who would talk to “him” (presumably Mr. Avila) to try to get him to “retract and recant” his statement. On rebuttal, the prosecutor stated:
[ADA]: When [defense counsel] looked you in the eye and said that “recant” can be another word for truth, that was disingenuous.
About as disingenuous as what [other defense counsel] said during opening when she told you all that this won’t be a second degree battery because they won’t have any independent proof that he was knocked unconscious.
[Defense counsel] knows the law. Even if he wasn’t knocked unconscious those broken bones are enough. Even if he wasn’t she knows the law.
1 iyiShe stood up in front of you and mislead [sic] you on the law intentionally.
Defense counsel objected. The court sustained the objection, advising the prosecutor, “Let’s not get this personal, sir.” After the jury retired to deliberate, counsel moved for a mistrial based on this and other arguments. The defendant now merely lists this as one example of the state’s improper argument.
This court considered a similar argument in State v. Celestine, 12-1541 (La.App. 4 Cir. 12/18/13), 131 So.3d 947, where the prosecutor accused defense counsel of “pandering” to the jury by attacking the integrity of the police force, thereby trying to shift the focus of the trial from the defendant to the police department. In rejecting this argument, this court credited the common sense and fair-mindedness of the jurors and found that this argument did not improperly influence the jury or contribute to the verdict.
Here, while the prosecutor’s argument was improper, which the trial court found by sustaining defense counsel’s objection, crediting the common sense and fair-mindedness of the jurors, we do not And that this particular argument unduly influenced the jury or contributed to the verdict. Thus, the court did not err by denying the motion for mistrial on the basis of this statement.
Mr. Cushenberry also points to argument by the prosecutor concerning the state’s inability to prosecute Mr. Avila for possessing the crack cocaine. In response to defense counsel’s argument concerning Mr. Avila’s credibility, the prosecutor noted that Mr. Avila testified and admitted that he committed a felony. The prosecutor insisted that Mr. Avila did not testify in exchange for any promise not to prosecute him for possessing the crack cocaine. The prosecutor then noted that although the state could still pursue charges against Mr. Avila, it would be Isndifflcult to do so because it could not show the jury the cocaine or test it to prove that Mr. Avila actually had cocaine. The prosecutor stated: “We don’t have it. And do you know why?” Defense counsel objected, noting that the state could still prosecute Mr. Avila. The prosecutor then stated: “Actually, we couldn’t because we can’t test the drugs that your client stole.” *795 The court stopped the argument, noting that the state “can prosecute who, when, however they [sic] wish, with or without evidence. Now go ahead.” The defendant contends that this argument was “false,” but the prosecutor was merely explaining why it would be difficult to prosecute Mr. Avila for possessing the cocaine. In addition, we find. that this argument was in response to argument by defense counsel about Mr. Avila’s motive for testifying that the defendant broke into his house and robbed him. Mr. Cushenberry has not shown that the trial court erred by denying his motion for mistrial based upon this argument.
The remaining argument referenced by the defendant, also occurring during the state’s rebuttal argument, attacked the defense theory of how the defendant entered Mr. Avila’s house, which the prosecutor termed “ridiculous” and “physically impossible.” Counsel objected, arguing that the state was improperly attempting to shift the burden to defense. At counsel’s suggestion, the court re-advised the jury that the prosecutor’s statements were merely argument and “the burden of proof is exclusively upon the state.” Later, when answering defense counsel’s argument as to what type of person would break into a person’s house to steal $20 worth of crack cocaine, the prosecutor theorized that the defendant broke into Mr. Avila’s home because he could not wait to get cocaine. He then stated: “Their case is implausible and it’s impossible.” Defense counsel again objected, noting that the defense did not have a case; the state did. The court agreed, [S1 advising the jury again that the burden of proof was exclusively on the state, and that the defense “need not do anything whatsoever. They [sic] have no burden of proof; they [sic] have no burden of persuasion.” The prosecutor then concluded his argument by stating: “I’ll leave you with exactly what [defense counsel] just said and I’ll sit down. They have no case whatsoever.” After the jury retired to deliberate, counsel included this argument in her motion for mistrial, arguing that this argument improperly shifted the burden to the defense, even though the court instructed the jury that the defense had no burden. The court denied the mistrial on this basis.
This court rejected a similar argument in State v. Bailey, 12-1662 (La.App. 4 Cir. 10/23/13), 126 So.3d 702. The defendant therein alleged that the prosecutor referred to facts not in evidence and shifted the burden to the defense. This court noted:
“While the prosecution must base its conclusions and deductions in closing argument upon evidence adduced at trial, both the State and defense are entitled to their own conclusions as to what is established by the evidence, and either may press upon the jury any view arising out of the evidence. State v. Sayles, 395 So.2d 695 (La.1981); State v. Everett, 2011-0714 (La.App. 4 Cir. 6/13/12), 96 So.3d 605, writ denied, 2012-1593, 2012-1610 (La.2/8/13), 108 So.3d 77.” Id. at p. 15,126 So.3d at 712. This court found that the prosecutor’s comments concerning the defense failure to call witnesses to back its argument “merely restated evidence or lack thereof that was presented during trial.”
Id., 12-1662 at p. 16,126 So.3d at 713.
This court stated: “Taken in context, the prosecutor argued only that the jury had the responsibility of evaluating the credibility of all the witnesses in the same manner.” Id. at pp. 16-17, 126 So.3d at 713.
laaHere, the prosecutor’s statements did not even rise to the level of those in Bailey, which this court found did not shift the burden to the defendant. Rather- than *796 shifting the burden, the prosecutor’s argument in this case merely pointed out the improbability of the defense theory of the case. The prosecutor’s choice of the word “case” rather than “theory” did not transform the argument into an inference that the defense had to present a case. The trial court repeatedly informed the jury that the state had the sole burden of proof at trial. Thus, the trial court did not err by denying the defendant’s motion for mistrial on the basis of these statements.
This assignment has no merit.

CONCLUSION

None of the assignments of error raised by the defendant has merit. Accordingly, the defendant’s convictions on all three charges and his attempted armed robbery sentence are affirmed. With respect to his battery and home invasion sentences, because the trial court did not rule on his motion for reconsideration of sentence, we remand this case for a ruling on the motion and for correction of the patent errors in these sentences detailed above, reserving to the defendant his right to appeal his sentences once the trial court has ruled on his motion to reconsider them.
CONVICTIONS AFFIRMED; ATTEMPTED ARMED ROBBERY SENTENCE AFFIRMED; REMANDED.

. The state earlier charged Mr. Cushenberry in case number 508-975 with armed robbery and home invasion, but it nolle prosequied that case a few days after filing the bill of information in the present case

. We note the similarity between “Amigo,” the name that Mr. Avila said he was called by the defendant, and the name "Migo.”

. We find no reference to this in Mr. Cushen-berry’s statement.

. The court failed to observe the twenty-four-hour delay between the denial of the motion for new trial and sentencing as mandated by La.C.Cr.P. art. 873. However, the defendant implicitly announced the waiver of this delay when the court asked if there was anything else that the defense or anyone else wanted to present before the court imposed sentence, and counsel merely asked for leniency in sentencing.

. See State v. Hearold, 603 So.2d 731 (La. 1992).

. In the in camera argument, counsel merely reiterated her argument that she would have cross-examined Mr. Avila about the 2x4, but the court again noted that counsel obtained the photo prior to cross-examination.

. The record of the prior case, number SOS-975, is an exhibit to this appeal. This report is not contained in the record. However, trial counsel in the present case enrolled in the prior case a little over a month before the state nolle prosequied it.

. In addition, the court allowed the defense to present further reasons in camera why the court should grant the mistrial. These reasons were mostly a reiteration of the argument already presented. In addition, counsel acknowledged that she did not recall either Officer Rice or Mr. Avila to cross-examine them on the inconsistencies contained in Mr. Avila's initial reporting of the incident because she did not want the jury to believe that counsel was unprepared for trial, allowing them to draw an "unfavorable inference” toward the defendant and his counsel. The court reiterated its denial of the motion for mistrial.